731 So.2d 356 (1999)
STATE of Louisiana
v.
Elbert RATCLIFF.
No. 98-KA-101.
Court of Appeal of Louisiana, Fifth Circuit.
February 23, 1999.
*358 Paul D. Connick, Jr., District Attorney, Terry Boudreaux, Rebecca J. Becker, Assistant District Attorneys, Gretna, Louisiana, Attorneys for Plaintiff/Appellee.
Laurie A. White, Louisiana Appellate Project, New Orleans, Louisiana, Attorney for Defendant/Appellant.
Panel composed of Judges H. CHARLES GAUDIN, SOL GOTHARD and JAMES L. CANNELLA.
GOTHARD, Judge.
The defendant, Elbert Ratcliff, was convicted of the second degree murder of Mr. John Adams, in violation of La. R.S. 14:30.1, and he was sentenced to the statutorily mandated term of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. Defendant appeals. We affirm the conviction and sentence of the defendant.

FACTS
Detective Robert Murphy, employed by the Jefferson Parish Sheriff's Office, testified that at approximately 6:15 a.m. on December 27, 1995, he investigated an occurrence at 700 Calhoun Street. He was the first police officer to arrive at the scene, and upon his arrival he found a King Cab taxi cab that had run into an obstruction on the side of the street. The cab's motor was still running, the lights were still illuminated, the driver's door was open and the passenger door on the driver's side was slightly ajar. He observed a white male, who appeared to have died from a gunshot wound, in the front seat of the cab. The man was later identified as John Adams.
Officer Hymel arrived not long thereafter, and the scene was secured. The officers called both an ambulance and the police station. There were no bystanders near the cab at the time of the officers' arrival. Detective Sacks, the primary investigator, also arrived on the scene. He also saw that the cab was still running, with headlights on and that the doors were open. He further stated that there was a plastic bag hanging from the left rear passenger door handle.
Lieutenant Buras, Homicide Commander with the Jefferson Parish Sheriff's Office, testified that he arrived at the crime scene at around 7:00 a.m. He processed the initial scene, after which the victim's body was removed from the cab and the cab was towed for further processing at the Detective Bureau. Lieutenant Buras testified that some evidence was collected from inside the cab at the scene; however, most was left inside the cab for processing the next day after the cab had been towed to the police station.
Mr. William Vieira, who was employed with the Jefferson Parish Sheriff's Office as a Crime Scene Technician, worked at the crime scene on December 27, 1995. He arrived at approximately 6:40 a.m., and he took a series of photographs of the crime scene. He also collected various other items of evidence, including numerous King Cab business cards, which were taken from both inside and outside the cab. Mr. Vieira testified that he did not pick up all the business cards in the cab, *359 and he did not pick up the business cards under the victim's feet, as he was advised that the vehicle would be processed later. Sergeant Durel analyzed the cards processed by Mr. Vieira.
Detective Patricia Lusk processed the business cards which were inside the cab under the victim's feet. She also received the cards processed by Mr. Vieira. She testified that the defendant's fingerprints were found on two of the business cards, one which was found outside the cab and one which was found under the victim's feet.
Detective Thornton testified that he inspected the victim's cab after it was moved to the garage for processing. Based upon the blood spatter found on the cab's interior, Officer Thornton determined that the murderer was sitting in the left rear passenger seat at the time the victim was shot. The detective also testified that a plastic bag found hanging from the left rear passenger door handle had some blood which had been deposited with some force, probably by splatter.
Thereafter, the defendant was arrested and he gave a statement to Detective Sacks. In his statement he said that he was not in the parish at the time of the victim's murder and that he did not know who killed the victim.
During the course of his investigation, Detective Sacks was able to ascertain that the defendant had visited the occupants at 713 Calhoun Street on a number of occasions prior to the shooting, although defendant denied knowing the residents of that house. The cab company's records reflect that a cab was dispatched to 713 Calhoun Street at 4:03 a.m., on the day of the crime.
Subsequently, defendant gave a second statement to Detective Sacks. Defendant again denied knowing who had murdered Mr. Adams. In this second statement, defendant told the officer that on the night of the murder, he was getting high with a convicted felon named "Payton" at an address on Sibley Street when he heard a single gunshot. Defendant claimed that he thought that the shot came from the direction of the police station. Thereafter, defendant "smoked a rock" and then walked through a short cut to Calhoun Street to find "somebody with some fake rock." He entered Calhoun Street near a bar. Defendant, who knew that it was past midnight but could not remember the exact time, claimed that when he got to Calhoun Street, he saw a man sitting in a cab.
Defendant claimed further that he approached the back of the cab, noticed that the exterior lights were illuminated, and thought that the cab driver was drunk. Defendant saw a dark pouch near the steering wheel in the cab. He stated that "I thought they had money in it, so I opened it up and saw a number of cards. I just threw it down and left." He admitted that he had handled the business cards that were inside the cab, but he did not touch the cab driver.
Defendant made a third statement to Detective Sacks, in which he admitted that he had witnessed the murder of the victim. He claimed that he was walking from Sibley Street, where he had been smoking crack cocaine with a man named "Paton," to Calhoun Street. He could not say what time it was because he was not wearing a watch, but he knew that it was early in the morning. As he reached the bar located in the middle of Calhoun Street, he saw Teddy Chester sitting in the rear seat directly behind the cab driver. The cab's interior lights were not illuminated, but the defendant claimed that the street lights were illuminated.
According to defendant, he saw Chester striking the cab driver with a pistol that was black with a dark colored wooden handle. Defendant thought that the gun was a .38 caliber revolver. He saw the cab driver attempt to drive away, and he saw Teddy shoot the cab driver in the back of the head. Defendant stated that Teddy got out of the cab, placed the gun inside *360 his jacket and ran away. Defendant said that after about ten minutes passed, he approached the cab, leaned inside and grabbed a pouch from the cab's console area to find if there was any money inside. The pouch did not contain money, so he threw it down. He thought that the cab driver was already dead. He then went home.
In this third statement, defendant admitted that he had heard of Chester and that he knew of him, but he denied that he "hung" with Teddy. Defendant told the officers that Chester killed the cab driver. He told the officers that he did not tell them about Chester because he was scared for himself and his family. He again admitted that the only reason that he entered the cab after the shooting was to find some money to buy crack cocaine. Defendant states that he did not harm the cab driver in any way, and that he was not armed with anything at the time he entered the cab.
Detective Sacks continued his testimony by stating that subsequent investigation disproved many of the defendant's assertions. Detective Sacks also explained that his investigation revealed that the defendant was the owner of the plastic bag found hanging on the handle of the left rear passenger door.
Ms. Donna LaRocca, who was employed as a driver and an office manager with the King Cab Company at the time of the victim's death, testified that her employer maintained a dispatch log. She identified a photocopy of the log, which reflected that at 4:03 a.m. on December 27, 1995, the victim's cab was dispatched to 713 Calhoun Street. She testified that she knew the defendant on a professional basis, as he was a regular customer of the King Cab Company and she had driven him in her cab before. Ms. LaRocca claimed that she could identify the defendant's voice over the telephone. She also testified that the defendant sometimes used the King Cab Company's services with an individual named Teddy Chester.
Ms. LaRocca testified that the Saturday after the victim's murder, she was working in the office, and a King Cab driver was dispatched to an address on Richards Street. Upon arriving at the address, the driver refused to pick up the two people who were waiting for him, one of whom was the defendant. He called the office and spoke to Ms. LaRocca, telling her "Donna, you know me, you know I ride you all the time. I need to get where I'm going." Ms. LaRocca herself went to the address and picked up the defendant and Mr. Chester. Ms. LaRocca testified that during the cab ride, she apologized for the other driver's refusal to pick them up, explaining that most of the drivers were nervous because of the death of the victim. Ms. LaRocca said that the defendant and Mr. Chester said something about hoping the police caught the perpetrators quickly, because they were tired of having trouble catching cabs in their area. The two men asked her if the police had any leads, and she replied that there were none that she was aware of. She told the two men that she believed that the death was gang related, because of the way the victim was killed, whereupon the defendant immediately told her "Oh no, it wasn't gang related. It was probably somebody wanting drug money."
At the trial, Ms. LaRocca also testified that the victim habitually kept his money in a pouch around his neck and that he used that money to give customers change.
Ms. Quinice Pollard, who was Mr. Chester's live-in girlfriend at the time the victim was murdered, also testified. She testified that the defendant and Mr. Chester knew each other at the time of the victim's murder, and that the defendant came to their house looking for Mr. Chester after the murder. Although Mr. Chester was home at that time, she told defendant that he was not at home.
Ms. Quinice Pollard's sister, Ms. Caprice Pollard, also lived with her sister and Mr. Chester. Following the murder, the defendant *361 came to their house on two occasions looking for Mr. Chester. After talking to Chester, she told defendant that he was not home.
Dr. Frazier MacKenzie, a pathologist with the Jefferson Parish Sheriffs Office, performed the autopsy on the victim. He testified that the victim died from a gunshot wound to the back of the head. The wound was a contact wound, which meant that the gun was placed directly against the victim's head as it was fired. He noted that the only other injuries on the victim's body were small abrasions to his nose and abdomen.
Mrs. Adams, the victim's mother, also testified. She explained that her son was thirty-four years old, and that he was very close to his family. She testified that her son was also her best friend, and that he was particularly close to his sister, Katie.
No witnesses testified on the defendant's behalf.

ANALYSIS
In his first allegation of error the defendant alleges that there was insufficient evidence to support the verdict. The defendant argues that 1) the state failed to prove that appellant killed the victim or was a principal to the killing and that the killing occurred while appellant was engaged in the perpetration or attempted perpetration of an armed robbery, and 2) the state failed to prove that the King Cab business cards which bore appellant's fingerprints were found inside the victim's cab, and therefore could not demonstrate that appellant was at the scene prior to the murder.
The appropriate standard of review for determining the sufficiency of the evidence was set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In Jackson, the Supreme Court explained that when assessing the sufficiency of the evidence, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. See also, State v. Rosiere, 488 So.2d 965 (La. 1986).
Regarding circumstantial evidence, LSA-R.S. 15:438 provides as follows:
The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.
In State v. Guccione, 96-1049 (La.App. 5 Cir. 4/29/97), 694 So.2d 1060, 1067, writ denied, 97-2151 (La.3/13/98), 712 So.2d 869, this Court discussed the usage of circumstantial evidence to prove guilt as follows:
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The requirement of La. R.S. 15:438 does not establish a standard separate from the Jackson standard, but rather provides a helpful methodology for determining the existence of reasonable doubt. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. (Citations omitted).
With respect to the credibility of witnesses, the Louisiana Supreme Court has stated:
It is the role of the fact-finder to weigh the respective credibilities of witnesses, and this court will not second-guess the credibility determinations of the trier of fact beyond our sufficiency evaluations under the Jackson standard of review.
State ex rel Graffagnino v. King, 436 So.2d 559, 563 (La.1983). It is not the function of the appellate court to assess the credibility of witnesses or to reweigh the evidence. Rosiere, 488 So.2d at 968.
*362 In this case, defendant was convicted as a principal to the crime of second degree murder. Thus, in this case the state had to prove that the victim was killed while defendant was engaged in the perpetration or attempted perpetration of an armed robbery.
Regarding the concept of principals, LSA-R.S. 14:24 provides as follows:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
However, "[m]ere presence at the scene is not enough to `concern' an individual in the crime." State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, 428.
Here, the state offered sufficient proof from which the jury could have reasonably inferred that the defendant was in the cab at the time of the murder. At trial it was established that the defendant was the owner of the plastic bag that contained a Guess shirt that was found hanging on the door handle of the left rear passenger door. Detective Thornton testified that the plastic bag possibly had blood spatter on it. He explained that the spatter indicated that the blood was moving at a high velocity when it was deposited on the bag, such as would occur when blow-back from a wound occurs. Therefore, the jury could have inferred that the defendant was present in the cab at the time the victim was shot.
Furthermore, Ms. LaRocca testified that the Saturday following the shooting, the defendant remarked to her that the shooting was not gang related, and that it was probably somebody wanting drug money.
Finally, the jury heard the defendant's three statements. They heard that he originally denied ever going near the cab. They also heard that he then recanted this story and admitted that he was high at the time of the murder and he had gone inside the cab to look for money for drugs. The defendant initially denied knowing who shot the victim and denied witnessing the crime, but he then recanted this story and claimed that, while standing at the corner of a nearby bar, he witnessed Chester hitting the cab driver with a gun and then shoot the cab driver in the back of the head. However, Dr. MacKenzie testified that there was no evidence of any trauma, other than the gunshot wound, to the victim's head. Although the defendant steadfastly denied that he was in the cab at the time of the shooting, the jury could have chosen to believe that he was lying when he gave his second and third statements, just as he had lied when giving his first statement.
In his statements, the defendant admitted that he knew Chester, but he denied that they did things together. However, both Quinice and Caprice Pollard testified that the defendant and Chester did sometimes do things together, and that, after the murder, the defendant came to visit Chester on two occasions. Finally, the defendant denied knowing anyone at the residence at 713 Calhoun, which was the address to which the victim was dispatched, but later police investigation proved that the defendant was lying about this as well.
With respect to the defendant's complaint that the state failed to prove that he was engaged in the perpetration or attempted perpetration of an armed robbery at the time of the victim's death, the defendant's second and third statements establish that the defendant entered the cab intending to steal money for drugs. In fact, although he denied that he was in the cab at the time the victim was killed, he admitted that he looked inside the victim's pouch for money and that when he found business cards instead, he threw them down. The crime scene reflected that someone had scattered King Cab business cards both inside and outside the cab. The defendant told Ms. LaRocca that *363 the perpetrators were probably looking for drug money.
Based on the entirety of the testimony and the evidence presented by the state a rational trier of fact could have found that defendant was an active participant to an attempted perpetration of an armed robbery at the time the victim was killed.
In his second assignment of error, defendant argues that he was deprived of a fair trial when the prosecution introduced an inculpatory statement of appellant at trial without prior notice to the defense. In his third allegation of error he alleges that the trial court erred in allowing inadmissable hearsay testimony into evidence. The defendant complains in both of these assignments that the trial judge erred in failing to grant a mistrial.
Pursuant to La.C.Cr.P. art. 775, a mistrial shall be ordered, and in a jury case the jury dismissed, upon motion of the defendant, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
Mistrial is a drastic remedy and, except in instances in which mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. State v. Smith, 433 So.2d 688 (La.1983). Whether a mistrial should be granted is within the sound discretion of the trial court, and denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion. State v. Brown, 96-1002 (La.App. 5 Cir. 4/9/97), 694 So.2d 435, 439, writ denied, 97-1251 (La.10/31/97), 703 So.2d 19.
Ms. LaRocca testified that when she told the defendant that she believed the victim's murder was gang related, he responded "oh no, it wasn't gang related. It was probably somebody wanting drug money." The defendant complains that this was an inculpatory statement made by him, and that the state failed to advise him of its intent to use said statement, as required by C.Cr.P. art. 768. He urges that he was unfairly prejudiced by the state's use of this statement because (1) it caused the jury to infer that he was in the taxi cab with Chester when Chester shot the cab driver, and (2), it resulted in unfair surprise to the defense.
We do not believe that the statement at issue was an inculpatory statement within the confines of La.C.Cr.P. art. 768. In the context of La.C.Cr.P. art. 768, an inculpatory statement is an out-of-court admission of incriminating facts made by a defendant after a crime has been committed. State v. Quimby, 419 So.2d 951 (La. 1982). The statement at issue is not an admission of guilt, nor does it admit to any specific fact or circumstances.
Assuming arguendo, that the statement may be deemed inculpatory, we find no reversible error in the trial court's failure to grant a mistrial. This court, in State v. Cathey, 493 So.2d 842, 851 (La. App. 5 Cir.1986), writ denied, 500 So.2d 419 (La.1987) said:
The purpose of the notice requirement of C.Cr.P. art. 768 is to prevent surprise and allow adequate time for the preparation of a defense. Reversal is not mandated when the defendant does not show that he was prejudiced by the State's failure to provide written notice. If a defendant merely asserts that he was "surprised", but offers nothing to show how he would have prepared for trial differently, a reversal is not warranted. (Citations omitted).
Here, defendant asserts he was surprised, but he does not show how he would have prepared his defense differently had he been given notice.
Defendant also complains that the trial judge failed to admonish the jury regarding Ms. LaRocca's testimony. However, the defense counsel did not request that an admonition be given to the jury. "In the absence of such a request, *364 the trial judge need not admonish the jury." State v. Mayer, 589 So.2d 1145, 1151 (La.App. 5 Cir.1991), writ denied, 609 So.2d 251 (La.1992).
Defendant next complains that the trial court erred in failing to grant a mistrial following the testimony given by Quinice Pollard, in which she said "I told him [defendant] that he wasn'tTeddy told me to say that he wasn't there. That is what I told him." Defendant moved for a mistrial, which was tacitly denied by the trial court. Defendant did not object to the trial judge's denial of the motion for mistrial and, therefore, this issue cannot now be complained about. LSA-C.Cr.P. art. 841; State v. Jasper, 506 So.2d 211, 213 (La.App. 5 Cir.1987). Furthermore, again defendant did not request that an admonition be given to the jury to disregard Ms. Quinice Pollard's testimony, and therefore no admonition was required.
Finally, defendant alleges that the trial court erred in failing to grant a mistrial after Detective Sacks testified that he was able to determine that the bag found inside the cab belonged to defendant. Defendant claims that this was an indirect means of placing Teddy Chester's hearsay statement, in which he told police officers that defendant owned the bag, in front of the jury.
A police officer, in explaining his own actions, may refer to statements made by others persons involved in the case, not to prove the truth of the assertion, but to explain his actions in the investigation of the case. Where the officer does not testify regarding the substance of anything that another person told him, but instead testifies regarding the results of his investigation, that testimony is not hearsay. State v. Smith, 97-1075 (La.App. 5 Cir. 4/15/98), 710 So.2d 1187.
We find that the trial court did not commit reversible error in refusing to grant any of defendant's motions for mistrial.
In assignment of error number four, the defendant complains that the trial judge erred by allowing prejudicial victim impact testimony. Defendant complains that the prosecutor elicited testimony from the victim's mother which was overly emotional and which caused her to begin sobbing on the stand in the jury's presence. Defendant contends that any probative worth that her testimony may have had was outweighed by prejudicial effect of her emotional impact on the jury. Defendant also complains that the prosecutor thereafter made similar prejudicial comments during his closing argument.[1]
Evidence may be excluded if its probative value is substantially outweighed by its prejudicial effect. La. C.E. art. 430. At trial, defense counsel objected to Ms. Adams' testimony as "getting to the area of prejudice." The trial judge did not sustain this objection, nor did he require the prosecutor to end his examination of the witness. The trial judge is vested with wide discretion in determining the relevancy of evidence, and his ruling will not be disturbed on appeal in the absence of a clear showing of abuse of discretion. State v. Miles, 402 So.2d 644, 647 (La.1981). In addition, the trial judge did instruct the jury before it retired to deliberate that it was "not to be influenced by sympathy, passion, prejudice, or public opinion." We see no reversible error in this ruling of the trial judge.
Defendant also argues that the prosecutor's comments during rebuttal argument, in which he said "Look at Ms. Adams sitting there. Her son lost his life in that cold, hard way. That's a tough thing to look at" improperly influenced the *365 jury. However, complaints regarding the state's closing argument do "not constitute reversible error unless the appellate court is thoroughly convinced that the remarks influenced the jury and contributed to the verdict." State v. McCorkle, 97-966 (La. App. 5 Cir. 2/25/98), 708 So.2d 1212, 1218. In light of the trial court's instruction to the jury that it was "not to be influenced by sympathy, passion, prejudice, or public opinion" we do not believe that the prosecutor's remarks during rebuttal contributed to the verdict. We find this allegation to be without merit.
In assignment of error number five the defendant complains that the trial judge erred in permitting Ms. Caprice Pollard to testify because, during cross-examination, she stated that she did not understand the oath she had taken that required her to tell the truth while testifying. However, at that time the defense attorney did not object to Ms. Pollard's competency to testify, La.C.Cr. P. art. 841, and thus did not allow the trial judge the opportunity to rule on the objection and thereby prevent or cure an error. State v. Soler, 93-1042 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069. Accordingly, this issue was not preserved for appellate review.
In assignment of error number six, the defendant requests that we review the entire record for errors patent. We have reviewed the record for errors patent in accordance with La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975) and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990) and we note the following error.
The trial judge did not advise the defendant of the three year prescriptive period for post-conviction relief as mandated by LSA-C.Cr.P. art. 930.8(C). We therefore remand this case and order the trial judge to inform the appellant of the provisions of this article by sending appropriate written notice to him within ten days of this Court's opinion and to file written proof that the appellant received such notice. State v. Bates, 96-9 (La.App. 5 Cir. 4/16/96), 673 So.2d 1085.
For the above discussed reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED WITH ORDER.
NOTES
[1] The defendant's argument relies upon State v. Bernard, 608 So.2d 966 (La.1992), which discusses the admissibility of victim impact testimony pursuant to LSA-C.Cr.P. art. 905.2. However, LSA-C.Cr.P. art. 905.2 and State v. Bernard apply to capital sentencing hearings and are inapplicable to the instant claim.