902 So.2d 485 (2005)
STATE of Louisiana
v.
Eric WILLIAMS.
No. 04-KA-1309.
Court of Appeal of Louisiana, Fifth Circuit.
April 26, 2005.
*488 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Thomas J. Butler, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Jane L. Beebe, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
*489 Eric Williams, Angola, LA, In Proper Person.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SUSAN M. CHEHARDY and CLARENCE E. McMANUS.
CLARENCE E. McMANUS, Judge.

STATEMENT OF THE CASE
On June 5, 2002, the Jefferson Parish District Attorney filed a bill of information charging defendant, Eric Williams, with armed robbery in violation of LSA-R.S. 14:64 in Count 1; aggravated battery in violation of LSA-R.S. 14:34 in Count 2; and possession of a firearm while in possession of marijuana in violation of LSA-R.S. 14:95(E) in Count 3. Defendant was arraigned on June 6, 2002 and pled not guilty. On January 30, 2003, defendant's motion to suppress evidence was denied. The State amended the bill of information on January 14, 2004 to change the date of occurrence on Counts 1 and 2 from April 14, 2002 to April 13, 2002.
January 14 and 15, 2004, the case was tried before a twelve-person jury and defendant was found guilty as charged. The trial court sentenced defendant on February 3, 2004 to imprisonment at hard labor for eighty-five years on Count 1, ten years on Count 2, and ten years on Count 3, with all sentences to run consecutively for a total of 105 years, without benefit of parole, probation, or suspension of sentence on Count 1. The trial court also ordered defendant to pay a $1,000 fine in connection with Count 3. Defendant objected to the sentence and orally moved for an appeal. On March 4, 2004, defendant filed a written motion for appeal that was granted. On that same date, defendant filed a motion to reconsider sentence.[1]

FACTS
Teresa Levy, a manager at Popeye's on Lapalco Boulevard, testified that, on April 13, 2002, as she was sorting her money, she heard the glass of the front door break and saw a shadow out of the corner of her eye. Levy picked up the telephone and was getting ready to dial 911 when she heard someone hollering, "[w]here is the manager? Bring her to me." Before she could do anything, a man grabbed the telephone and told her she was not going to dial 911. He flung the telephone, picked her up by her shirt, told her to get up, and threw her backwards against a wall.
Levy testified that the man had a handgun, that he was dressed completely in black, and that he was wearing black pants, a black jacket, and gloves. She could not see his face because he had on a ski mask and a neck warmer which covered his mouth. She positively identified State's Exhibit 4 as the ski mask and State's Exhibit 5 as the neck warmer that the perpetrator was wearing. Levy explained that she saw enough of his skin through the eyeholes to tell that it was a black male. She further testified that defendant was the same height as the man who attacked her.
After the man grabbed Levy, he pointed to the safe and told her to open it. When she told him it would take too long to do so, the man got angry, and put her back up against the registers. She testified that defendant had $1,000 in his hands which was money she had previously bundled and dropped. He kept trying to give the money back to her and told her to put it in a bag. He asked for more money, but *490 she told him he already had the money and that was it.
The man asked Levy if she saw the gun. He pointed it at her face and said he wanted the money. He then put the gun to the side of her head and told her he would kill her. She heard the gun click. The man flung Levy down in the service area and then told the other people in the restaurant to go to the back, chasing them as they did so.
Levy remembered there was a car parked in the parking lot, so she left the service area and stood behind the counter looking out the door and wondering whether she could notify these people about the robbery. When the man came back, he saw her and said, "[o]h no, uh-uh, you can't go." He grabbed her, struck her on the side of the head with the bottom of the gun, and the gun discharged. Levy sustained a fractured skull that required medical treatment. She testified that the man took approximately $3,200.
Jefferson Parish Sheriff's Office (JPSO) Det. David Spera testified that officers recovered a backpack in the rear of a parking lot behind Popeye's that contained clothing, ammunition for a firearm, a pair of binoculars, and a handwritten note. He explained that the backpack was found within 100 yards of Popeye's on the path that had been described to him by the Popeye's employees as the one the perpetrator used to escape, and that the bag and the clothing matched the description given to him by the employees. Det. Spera testified that a spent casing was found in front of the safe inside Popeye's.
JPSO Det. Jeffrey Rodrigue testified that a Hertz rental car receipt with a confirmation number on it was found in the backpack. Det. Rodrigue contacted the company who informed him that that car had been leased to a woman by the name of "Barbara Williams", defendant's mother, at 1805 Westminster Street. After learning that information, Det. Rodrigue went to Williams' house and knocked on the door.
Defendant opened the door, and Det. Rodrigue identified himself and told defendant that he wanted to speak to Williams. Defendant told Det. Rodrigue that that was his mother and that she was at work. When Det. Rodrigue asked defendant to provide him with his mother's place of employment and work telephone number, defendant could not give him an answer. Det. Rodrigue testified that defendant appeared to be nervous and very inquisitive as to why he was there.
Because of defendant's actions and tone of voice, Det. Rodrigue became suspicious. He called Det. John Carroll to meet him in the area. Dets. Rodrigue and Carroll went back to the residence. They knocked on the door, and this time they were met by a female who identified herself as "Barbara Williams." Det. Rodrigue informed her that he was investigating an armed robbery at Popeye's and asked her if he could speak to her about it.
Williams invited him in, and Det. Rodrigue asked her about the receipt. Williams confirmed that she had rented a vehicle from Hertz with that confirmation number. Det. Rodrigue asked Williams about the backpack, and she said she had seen the backpack at her house in the hallway, but that it was not there anymore.
In light of his conversation with Williams, Det. Rodrigue asked her if she would consent to a search of her residence for any possible evidence. Williams consented to the search and signed a JPSO "Consent to Search" form. Prior to the search, Det. Rodrigue asked Williams if defendant was at home, and she said he was not. Det. Rodrigue thought that was odd since he did not see anyone leave the *491 residence while he was parked down the street waiting for Det. Carroll to arrive.
Dets. Rodrigue and Carroll began to search the residence and found one room that was locked. Det. Rodrigue asked Williams if she had a key, and she said she did not, and that the room had not been opened in years and was a junk room. As they were talking to Williams in the hallway, the door that Williams said had not been opened in years opened up, and defendant walked out and began screaming at the detectives as to why they were in his house. Det. Rodrigue saw a black handgun sitting on a shelf in the room. Det. Carroll asked defendant to walk to the front of the residence for the detectives' safety. Det. Rodrigue went into the room to ensure that nobody else was in there. He saw a shotgun leaning against the wall, a large bag of marijuana on a bottom shelf, and a lot of money spread out on a top shelf. He advised defendant of his rights and informed him that he was under arrest for narcotics violations.
Det. Rodrigue testified that the handgun, shotgun, marijuana, $2,002, a pair of black sweatpants, a scale, a bowl, a knife, a gun cleaning kit, a gun lock, and a notebook were recovered from the residence. He further testified that the notebook contained handwriting that stated, "`[W]eed count, twenty dash fifty [20-50], four fourteen of two thousand and two [4-14-02].'" "`Kevin owns [sic] me twenty [20], Arone owns [sic] me thirty [30], Bruce owns [sic] me thirty [30].'"
JPSO fingerprint examiner Virgil McKenzie, who was accepted as an expert in the field of latent fingerprint examination and identification, testified that he positively identified defendant's left thumbprint on the Hertz rental car ticket.
Charles Krone of the JPSO crime lab, who was accepted as an expert in the field of narcotics analysis and identification, testified that he examined specimen 1, which was three Ziploc sandwich bags containing green vegetable matter, and specimen 2, which was ten Ziploc sandwich bags containing a green vegetable matter all contained inside of an Academy Sports plastic bag. Krone testified that the vegetable matter in both specimens contained marijuana, that the gross weight of specimen 1 was 81.48 grams, and that the gross weight of specimen 2 was 266.27 grams.
JPSO Lt. Bruce Harrison, who was accepted as an expert in the field of use, distribution, packaging, and value of narcotics, testified that the marijuana recovered in this case weighed three ounces less than a pound, and that at the time of the offense, a pound of marijuana was selling for $800 to $1,200. Lt. Harrison explained that the $1,200 missing from the $3,200 (stolen from Popeye's) would be indicative of the purchase of a pound of marijuana. Lt. Harrison further testified that the thirteen separate packages of marijuana recovered indicated to him they were meant for sale, that the bowl and scale was the type of equipment he would expect someone to possess who was breaking down the marijuana for sale, that it was common to find firearms in locations where narcotics were recovered, and that the notebook contained what appeared to be a crude tally sheet or an "owed sheet" that he would expect to find in a midlevel drug operation.
Bonnie Dubourg, who was accepted as an expert in the field of DNA analysis, testified that she received a ski mask, neck scarf, and defendant's blood sample. She testified that she was unable to find a genetic profile on the ski mask because of insufficient amount of cellular material or degraded material. Dubourg testified that she compared the genetic profile from the blood sample to the forensic sample on the neck scarf, and that the two profiles were *492 consistent with each other. She explained that there was a one in ten billion chance that the DNA on the scarf belonged to someone other than defendant.
Tim Scanlan of the JPSO crime lab, who was accepted as an expert in the field of firearms examination and analysis, testified that the fired cartridge that was found on the scene was fired in the handgun found in defendant's room.
Defendant testified that he did not rob Popeye's with a gun, and that he did not hit the victim in the head with a gun. He admitted that the guns, marijuana, and money were his, but denied being a drug dealer. He explained that the money did not come from Popeye's, but came from jobs he worked, settlements from lawsuits, and an income tax refund.
Defendant claimed that he loaned his mother's ex-boyfriend, Bruce Parnell, his backpack, gun, and neck warmer, that Parnell committed the armed robbery, and that he and Parnell were the same height and weight. He explained that Parnell had gotten into a confrontation with some men and wanted to use the gun for protection. He testified that Tyishika Murray saw him give the bag to Parnell, but not the gun, and that he never saw the bag again. He testified that Parnell brought the gun back later on, early that morning.
Murray testified that defendant gave Parnell the bag at approximately 9:00 p.m. on the night of the robbery while they were in her car, and that Parnell took the bag and went inside his house with it. She claimed that, after that night, she was driving a vehicle on Westminster, that Parnell was in the passenger seat, and that when they passed by defendant's residence and saw police there, Parnell slid down in the car so no one could see him. She testified that Parnell's right hand was bandaged due to an injury. She admitted that she never told anyone in law enforcement this information.
Jasmine Ricks and Angela Williams, defendant's sisters, testified that Parnell dated their mother at one time, that Parnell and defendant were the same height, but that Parnell was slimmer, and that Parnell never inquired about defendant or his situation.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant argues that the trial court erred in denying the motions for mistrial when the prosecutor told the jurors that defendant had been in jail for two years and when the prosecutor twice commented on his right to remain silent.
LSA-C.Cr.P. art. 775 provides that the trial court shall grant a mistrial when prejudicial conduct in or outside of the courtroom makes it impossible for the defendant to obtain a fair trial.
LSA-C.Cr.P. art. 770 provides as follows:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.

*493 An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
LSA-C.Cr.P. art. 771 provides as follows:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
The decision to grant or deny a mistrial is within the sound discretion of the trial court. The denial of a motion for a mistrial will not be reversed on appeal unless the court has abused its discretion. State v. Ratcliff, 98-101 (La.App. 5 Cir. 2/23/99), 731 So.2d 356, 363, writ denied, 99-1112 (La.9/3/99), 747 So.2d 541. Mistrial is a drastic remedy and is warranted only where remarks result in substantial prejudice sufficient to deprive defendant of a fair trial. State v. Overton, 618 So.2d 439, 441 (La.App. 5 Cir.1993).

Prosecutor's comments regarding defendant's being in jail
First, defendant argues that the trial court erred in denying his motion for mistrial when the prosecutor told the jurors that defendant had been in jail for two years.
The State responds that a mistrial was not warranted under LSA-C.Cr.P. art. 770, that the defense refused to request an admonition under LSA-C.Cr.P. art. 771, and that there was no error in the trial court's actions.
During the cross-examination of Jasmine Ricks, defendant's sister, the prosecutor stated, "[y]our brother has been in jail for close to two years now; is that correct?" Ricks testified, "I think that sounds about right." The prosecutor began to ask another question, but was interrupted when defense counsel asked the trial judge for permission to approach. At a bench conference, defense counsel moved for a mistrial, arguing that the prosecutor's comment that defendant had been in jail for two years was improper.
The prosecutor admitted he made the statement, but should not have. However, he argued that it did not rise to the level of a mistrial, and that the purpose for asking the question was to address the incredulity of the witness' brother sitting incarcerated for almost two years and not being able to tell them the whereabouts of someone who the defense wanted to suggest was the real perpetrator of the crime. Defense counsel stated that he had gone to great length to keep his client in civilian clothes to ensure that the jury did not know he was in jail, and through no fault of the defense, the prosecutor told the jury that he had been in jail.
*494 The prosecutor responded that this did not rise to the level of prejudice that would warrant a mistrial. He argued that defendant was arrested in connection with this matter, and that it would be of no great surprise to the jury that he would be held on such a serious charge. He stated that he did not suggest that defendant had committed any other act.
Defense counsel stated that the witness never said she knew who the perpetrator was nor was she going to say that, and that she was not there and did not know who had committed the crime. The trial court stated that the thrust of the defense's argument was that someone else had access to the items and had committed the crime. Defense counsel admitted that was true. The trial court then stated that there was no excuse for the statement about defendant being in jail, and that if the attorneys would not make arguments and go on "fishing expeditions" while questioning witnesses, this would not have happened.
However, the trial judge noted again that the question was related to the thrust of the defense, and that the State was right in saying that it was not unreasonable for the jury to assume that when someone was charged with armed robbery, aggravated battery, and use of firearms, that that person would be incarcerated pending trial on those charges. The trial judge added that he was going to admonish the jury to disregard that question and give it no weight, and to not consider it in their deliberations. The trial judge further stated that he was going to tell the State to move on and deny the request for mistrial.
The trial judge asked defense counsel whether he wanted him to disregard the matter or give a cautionary instruction. Defense counsel said that it was reversible error and could not be corrected, and he refused to request an admonition.
The comment made by the prosecutor does not fall under the provisions of LSA-C.Cr.P. art. 770 that automatically warrant a mistrial. The remark was only of such magnitude as to fall within LSA-C.Cr.P. art. 771 which requires an admonition if requested. Defense counsel did not request an admonition.
Additionally, we find, as the trial judge did, that it was not unreasonable for the jury to assume that a defendant who was charged with armed robbery, aggravated battery, and possession of narcotics and firearms would be incarcerated pending his trial on those charges. Further, we find that the remark did not result in substantial prejudice sufficient to deprive defendant of a fair trial. Based on the foregoing, we find that the trial court did not err in denying defendant's motion for mistrial.

Prosecutor's comments regarding defendant's right to remain silent
Defendant argues that the trial court erred in denying his motion for mistrial when the prosecutor twice commented on his right to remain silent.
The State responds that there was no Doyle violation in this case.[2] The State contends that the prosecutor's line of questioning was not used to indicate that defendant had invoked his right to remain silent after receiving his Miranda rights, but rather to discover why defendant failed to inform anyone that he was at home asleep at the time the crime was committed.[3]
During the cross-examination of defendant, the prosecutor stated, "Because having *495 been accused of an armed robbery at a Popeye's just a couple of days before, you no doubt told police no way, it couldn't have been me, I was home asleep, all you got to do is ask them. Is that right?"
Defense counsel asked to approach the bench. The trial judge said there was no need to approach and told defense counsel to state his objection and the legal basis for it. Defense counsel responded that it was an improper question. The trial judge overruled the objection and told the prosecutor to ask his next question. Defense counsel noted his objection and moved for a mistrial which the trial judge denied. The prosecutor then asked defendant, "You told the police you were home sleeping and all they had to do was ask your family. You did that, right?"
Defense counsel again asked to approach the bench. The trial judge told him to state his objection and the legal basis for it and not to approach the bench. Defense counsel said he was not permitted to do that by the United States Supreme Court and the Louisiana Supreme Court. The trial judge overruled the objection and told the prosecutor to ask his next question. Defense counsel said he was going to mark the time and would argue the matter later.
Later on during the cross-examination, the following exchange occurred: "Q. Are you telling this jury that Bruce did the armed robbery? A. Yes. Q. Did you ever tell the police that Bruce did the armed robbery?"
Defense counsel objected and asked to approach the bench, which the trial court allowed. Defense counsel argued that the prosecutor could not demonstrate in front of the jury his client's exercise of his right to remain silent. He stated that that was reversible error, and that the prosecutor had done it twice. He then moved for a mistrial and said that there was no instruction the court could give to overcome the "well-established" jurisprudence on this issue.
The trial judge allowed the jurors to take a break while counsel argued their respective positions. The prosecutor contended that the jurisprudence did not provide that he was doing anything improper. He contended that defendant was suggesting that someone else was the perpetrator, and that it was within the State's right to ask whether he told anyone in law enforcement, when he told them, or why he did not tell them.
Defense counsel argued that the jurisprudence, including Doyle v. Ohio, held that a defendant's silence cannot be used against him if he testifies at trial, and that if he testified at trial to an exculpatory version of the offense, he could not be impeached by the fact that he failed to give that explanation when he was arrested. Defense counsel reiterated his motion for a mistrial which the trial judge denied.
The trial judge then said that when they came back from their break, he wanted (the prosecutor) to "move through this cross-examination," to get "off of this topic" and not to "go near" it, and "to wrap this cross-examination up." The prosecutor indicated that he understood the judge's statement, and defense counsel noted an objection to the trial judge's ruling.
In Doyle v. Ohio, 426 U.S. 610, 620, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the defendants were charged with selling marijuana. Separate trials were held, and in both cases, the defendants claimed that they were framed. In an attempt to impeach the defendants' credibility on cross-examination, the prosecutor inquired of each defendant why they had not informed the arresting officer of this defense. The defendants appealed, contesting *496 the State's use of their silence to impeach their credibility at trial.
The United States Supreme Court held that reference to a defendant's silence at the time of his arrest and after he has received the Miranda warnings for impeachment purposes violates the defendant's due process rights. The Supreme Court explained, "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. . . it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Doyle v. Ohio, 426 U.S. at 617-618, 96 S.Ct. at 2244-2245, 49 L.Ed.2d at 97-98.
However, not every mention of the defendant's post-arrest silence is prohibited by Doyle. Doyle only condemns the use of defendant's silence at the time of arrest and after Miranda warnings for impeachment purposes. Meaning, a prosecutor cannot make reference to the fact that an accused exercised his constitutional right to remain silent, after he had been advised of the right, solely to ascribe a guilty meaning to his silence or to undermine, by inference, an exculpatory version related by the accused, for the first time at trial. State v. Arvie, 505 So.2d 44, 46 (La.1987); State v. Ledesma, 01-1413 (La. App. 5 Cir. 4/30/02), 817 So.2d 390, 393.
In contrast, an oblique and obscure reference to a defendant's post-arrest silence, where the examination does not stress the right to remain silent or attempt to elicit testimony regarding the defendant's failure to respond to police questioning, does not constitute reversible error. State v. Ledesma, supra at 393. Thus, the State may pursue a line of questioning that attempts to summarize the extent of the investigation, when such questions are not designed to exploit the defendant's failure to claim his innocence after his arrest in an effort to impeach his testimony or attack his defense. Id.
Another exception to Doyle exists when the evidence of post-arrest silence is relevant to rebut a defense-raised assertion that the arresting officer failed to properly investigate, or that defendant actively cooperated with police when arrested. State v. Bell, 446 So.2d 1191, 1194 (La.1984).
Under LSA-C.Cr.P. art. 771, when the prosecutor or a witness makes a reference to a defendant's post-arrest silence, the trial court is required, upon the request of the defendant or the State, to promptly admonish the jury. State v. Olivieri, 03-563 (La.App. 5 Cir. 10/28/03), 860 So.2d 207, 213. In such cases where the trial court is satisfied that an admonition is not sufficient to assure the defendant a fair trial, the court may grant a mistrial upon motion of the defendant. State v. Kersey, 406 So.2d 555, 559 (La.1981). The granting of a mistrial is within the discretion of the trial court if the trial court is satisfied that an admonition is not sufficient to assure the defendant a fair trial. State v. Procell, 365 So.2d 484, 491 (La. 1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979). A brief reference to a defendant's post-arrest silence does not mandate a mistrial or reversal when the trial as a whole was fairly conducted, the proof of guilt is strong, and the prosecution made no use of the silence for impeachment purposes. State v. Ledesma, supra at 393.
In State v. Lee, 38,114 (La.App. 2 Cir. 3/3/04), 868 So.2d 256, 263-265, writ denied, 04-1128 (La.10/8/04), 883 So.2d 1027, defendant argued that the State wrongly sought to impeach his exculpatory account, told for the first time at trial, by exploiting his failure to give similar information after *497 receiving his Miranda warnings at the time of arrest in violation of Doyle v. Ohio. The appellate court found that defendant had correctly identified a violation of Doyle v. Ohio, but concluded that the error was harmless due to the overwhelming evidence of defendant's guilt.
We find that the trial court did not err in denying defendant's motion for mistrial. The comments made by the prosecutor do not fall under the provisions of LSA-C.Cr.P. art. 770 that automatically warrant a mistrial. The remarks were only of such magnitude as to fall within LSA-C.Cr.P. art. 771 which requires an admonition if requested. Defense counsel did not request an admonition. Additionally, although the trial judge overruled the objections, defendant never answered the questions, and the trial judge instructed the prosecutor the third time to refrain from questioning defendant regarding this topic.
Also, it appears that the trial, in general, was fairly conducted and that proof of guilt was strong. State v. Lee, supra. The record shows that defendant's fingerprints were found on a rental car receipt found in a bag near the scene, that defendant was the most likely contributor of the DNA found on the neck warmer worn by the perpetrator and recovered from the inside of a bag at the scene, that the gun found in defendant's room was scientifically proven to be the gun used in the armed robbery at Popeye's, and that defendant admitted that the guns and narcotics found in his room belonged to him and that the bag found at the scene belonged to him.
Finally, we find that evidence of defendant's post-arrest silence was relevant to rebut a defense-raised assertion that the officers failed to properly investigate. State v. Bell, 446 So.2d at 1194. The main defense in this case was that Parnell committed the armed robbery. In fact, defense counsel asked Det. Spera whether he ever "considered" Parnell, and he asked Det. Rodrigue whether he asked anybody about Parnell during the investigation. Both officers responded that they had never heard of Parnell. Additionally, during closing argument, defense counsel pointed out to the jury that the State did not prove that Parnell did not commit the crime.
Since defense counsel suggested to the jury through its questioning of the detectives that the State had failed to investigate Parnell as a suspect in the armed robbery, the State was allowed to respond by asking defendant whether he gave police the lead that Parnell committed the armed robbery. See, State v. Bell, supra at 1194. Defendant may not imply that the State's case is the result of improper investigation without allowing the State to try to show the jury that the investigation was indeed thorough. Id. Only coincidentally was there at the same time a prejudicial effect upon defendant when this exploration also pointed up his post-arrest silence. Id.
Therefore, we find that the trial court did not err in denying defendant's motion for a mistrial.

ASSIGNMENT OF ERROR NUMBER TWO
Defendant argues that his 105-year sentence is constitutionally excessive because: (1) he is a twenty-six-year-old first time offender with no chance at rehabilitation; (2) the trial judge failed to mention any of the mitigating factors such as defendant's admission to possessing guns and drugs at the time of his arrest and to being a drug abuser; and (3) the trial judge ordered the sentences to run consecutively even though the armed robbery and aggravated battery were part of the same act or transaction.
*498 The State responds that the trial judge did not abuse his discretion in imposing defendant's sentence.
Defendant was convicted on January 15, 2004 and sentenced on February 3, 2004. On March 4, 2004, defendant filed timely motions for appeal and to reconsider sentence. The order granting the appeal was signed on March 25, 2004. However, the record does not indicate that the motion to reconsider sentence was ever ruled upon.[4]
In State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, 81, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481, this Court remanded the matter for a ruling on defendant's motions to reconsider sentence. This Court did not address the merits of defendant's excessive sentence claims, reasoning that it would be premature to rule on the excessiveness issue while a motion to reconsider sentence was pending because the present sentence may be vacated.
Since there has been no ruling on the merits of defendant's motion to reconsider sentence, we remand this matter for a ruling. If the motion to reconsider is granted and defendant is re-sentenced, he may appeal the new sentence. If the motion is denied, or if it already has been ruled on, defendant must move to re-lodge this appeal within sixty days of the date of the ruling on the motion to reconsider sentence or the date of the opinion, whichever is later. See, State v. Winfrey, supra; State v. Schieffler, 00-1166 (La.App. 5 Cir. 2/13/01), 812 So.2d 7, 11-12, writ denied, 02-0712 (La.9/13/02), 824 So.2d 1188; State v. Simmons, 00-1037 (La.App. 5 Cir. 2/28/01), 781 So.2d 821, 826.

PRO SE ASSIGNMENTS OF ERROR NUMBER ONE, FOUR AND FIVE
In his pro se assignment of error number one, defendant argues that the trial court erred when a motion to dismiss was denied on behalf of the ski-mask and neck-warmer, D.N.A. testing not positivly [sic] matching to Mr. Eric W. said person who was tryed [sic] in this case.
In his pro se assignment of error number four, defendant argues that the trial court erred when [it] fail[ed] to rule on the motion for dismissal of the consent to search form that clearly violates the appellee Eric Williams, and the person who was intimidated, threaten [sic], forced to sign the consent to search form. So, they the officers, could have a reason for wanting to search.
In his pro se assignment of error number five, defendant argues that trial court erred when [it] failed to dismiss the case on facts shown to the court that the evidence concerning the D.N.A. not matching Eric Williams 100% according to results from testing done by Ms. Bonnie Dubourg D.N.A. examiner, on the ski-mask, and neck-warmer which is what was worn by the robber, according to testimony from officers, there [sic] reports, and testimony from D.N.A. examiner Bonnie that phyicillay [sic] disconnected Appellee Eric Williams from this so called finding of a bag, officers say these items were in.
These assignments are addressed together because they all involve the trial court's denial of the motion to suppress evidence, particularly the ski mask and the neck warmer.
Defendant appears to be arguing that the trial court erred in denying his *499 motion to suppress the evidence, particularly the ski mask and the neck warmer. He contends that the ski mask and the neck warmer were inadmissible because DNA evidence showed that he could not have been the person who wore those items.
Defendant also appears to be arguing that the trial court erred in denying the motion to suppress evidence because the officers threatened, intimidated, and forced his mother, Barbara Williams, to sign the consent to search form. He claims that Williams was denied the opportunity to testify at trial that she did not understand she was waiving her rights when she signed the form, and that she was threatened and intimidated by the officers to sign the consent to search form.
A hearing was held on defendant's motions to suppress the evidence on January 30, 2003. At that hearing, Det. Jeffrey Rodrigue testified regarding his investigation of the armed robbery and the evidence that was recovered from the backpack found near the crime scene and from defendant's bedroom. Det. Rodrigue's testimony at the suppression hearing was very similar to his testimony at trial. However, the suppression hearing mainly involved the validity of the consent to search the house given by defendant's mother and the evidence recovered therein. After hearing the evidence, the trial judge denied the motion to suppress evidence without providing reasons.
At trial, Teresa Levy, the victim, testified that the perpetrator wore a ski mask and neck warmer which she positively identified as State's Exhibits 4 and 5, respectively. The State introduced those exhibits into evidence which the trial court admitted without objection by the defense.
As was stated previously, Bonnie Dubourg, who was accepted as an expert in the field of DNA analysis, testified at trial that she received a ski mask, neck scarf, and defendant's blood sample. She testified that she was unable to find a genetic profile on the ski mask because of insufficient amount of cellular material or degraded material. Dubourg testified that she compared the genetic profile from the blood sample to the forensic sample on the neck scarf, and that the two profiles were consistent with each other. She explained that there was only a one in ten billion chance that the DNA on the scarf belonged to someone other than defendant.
A trial court's decision to deny a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression. State v. Williams, 98-1006 (La.App. 5 Cir. 3/30/99), 735 So.2d 62, 73, writ denied, 99-1077 (La.9/24/99), 747 So.2d 1118. In determining whether the ruling on a motion to suppress was correct, the court is not limited to the evidence adduced at the hearing on the motion, but may consider all pertinent evidence given at the trial of the case. State v. Washington, 00-1542 (La.App. 5 Cir. 2/14/01), 782 So.2d 639, 645, writ denied, 01-0940 (La.2/8/02), 807 So.2d 859.
In the instant case, the ski mask and neck warmer were found in a backpack near the scene of the crime. They were not recovered pursuant to any illegal search and seizure that would necessitate suppression. Additionally, contrary to defendant's assertions, DNA testing showed that the neck warmer was most probably worn by defendant.
With respect to the consent to search form, Det. Rodrigue testified at the suppression hearing that Barbara Williams gave him the consent to search, and that no one forced her or threatened her in any way in order to procure the consent. At trial, Det. Rodrigue testified that Williams *500 consented to the search and that she was very cooperative and had no objections to them searching her residence. The defense cross-examined the detective regarding the consent to search form at the suppression hearing, and he had the opportunity again to do so at trial. There is no evidence in the record to support defendant's contention that the officers threatened, intimidated, and forced his mother to sign the consent to search form nor is there any evidence that defendant's mother was not permitted to testify at trial.
In light of the foregoing, we find that the trial court did not err in denying the motion to suppress the evidence or in admitting the ski mask and neck warmer into evidence.

PRO SE ASSIGNMENT OF ERROR NUMBER TWO
By this assignment of error, defendant argues that the trial court erred when they obstructed the changing of the trial transcripts to try and cover up the fact that more errors that were purposely looked over during trial and befor [sic] the completion of the records. Defendant further argues that the court is awhere [sic] that I, the appellee Eric W. was present at trial the whole time, members from my family, my trial attorney Martin Regan and, others new [sic] that these testimonyal [sic] statements were made and now see that they are changed, according to the physical evidence persented [sic] at trial and that still exist only for a period of time.
Defendant's assignment of error is unclear, and defendant did not elaborate on this issue in his pro se brief. As such, this Court cannot address this assignment of error.

PRO SE ASSIGNMENT OF ERROR NUMBER THREE
Defendant argues that trial court erred when failure to dismiss case on grounds of improper, incorrectly filing of indictment which didn't describe the things taken nor the correct date the incident happend [sic].
Defendant apparently argues that the bill of information was defective and should have been quashed because the date of the offense was incorrect and because it did not describe the things taken. He contends that the prosecutor said she intended to amend the bill to reflect the correct date of offense but that it was never done.
On June 5, 2002, the Jefferson Parish District Attorney filed a bill of information charging defendant, Eric Williams, with Count 1: armed robbery in violation of LSA-R.S. 14:64; Count 2: aggravated battery in violation of LSA-R.S. 14:34; and Count 3: possession of a firearm while in possession of marijuana in violation of LSA-R.S. 14:95(E).
Contrary to defendant's assertions, the State amended the bill of information on January 14, 2004 to change the date of occurrence on Counts 1 and 2 from "on or about the 14th day of April, 2002" to "on or about the 13th day of April, 2002." Additionally, the victim testified that the robbery occurred on April 13, 2002.
Defendant argues that the bill of information was defective because it did not describe the things taken. The time for testing the sufficiency of an indictment or bill of information is before trial by way of a motion to quash or an application for a bill of particulars. State v. Gainey, 376 So.2d 1240, 1243 (La.1979). A post-verdict attack on the sufficiency of an indictment should be rejected unless the indictment failed to give fair notice of the offense charged or failed to set forth any identifiable offense. State v. Williams, 480 So.2d 721, 722, n. 1 (La.1985). Because defense counsel failed to file a motion to quash, we *501 find defendant waived any claim based on the allegedly defective indictment. State v. Manning, 03-1982 (La.10/19/04), 885 So.2d 1044, 1090.
Notwithstanding the procedural bar to the claim, the Louisiana Constitution of 1974 provides an accused shall be informed of the nature and cause of the accusation against him. La. Const. art. I, § 13.
LSA-C.Cr.P. art. 464 implemented that requirement. It provides (footnote added):
The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.[5]
In the instant case, the State charged defendant by bill of information, which read, in pertinent part, that "Eric Williams. . . on or about the 13th day of April . . . in and for the Parish [of Jefferson] . . . violated R.S. 14:64 in that he did rob Teresa Levy while armed with a dangerous weapon, to wit: a firearm[.]"
To the extent defendant was unaware of the identity of the thing taken, he had the right to secure that information by filing a bill of particulars. LSA-C.Cr.P. art. 484; State v. Russell, 292 So.2d 681 (La.1974). The record reflects that defendant's trial counsel filed a bill of particulars, yet failed to request the identity of the thing taken in the armed robbery. Regardless, the record further reflects that trial counsel had fair notice of the offense charged.
The State filed a supplemental discovery receipt in response to defendant's motion for discovery and tendered to the defense a supplemental police report, DNA and crime lab reports, and medical records of the victim. In that pleading, the State also offered to provide open file discovery to defendant. Additionally, there is no suggestion on appeal that defendant was prejudiced in preparing his defense. Therefore, we find that the trial court did not err by failing to dismiss the case because of allegedly improper or incorrect filing of the indictment.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La. App. 5 Cir.1990). The review reveals the following errors in this case.
First, the record does not reflect that defendant was arraigned on the amended bill. LSA-C.Cr.P. art. 555 provides:
Any irregularity in the arraignment, including a failure to read the indictment, is waived if the defendant pleads to the indictment without objecting thereto. A failure to arraign the defendant or the fact that he did not plead, is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pleaded not guilty.
Because the defendant did not object to the failure to arraign him on the amended charge, the issue is waived. State v. Smith, 02-1018 (La.App. 5 Cir. 3/11/03), 844 So.2d 119, 126.
*502 Second, the trial court failed to specify that the sentence on Count 3 was to be served without benefit of parole, probation, or suspension of sentence as required by LSA-R.S. 14:95(E). According to LSA R.S. 15:301.1 and State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790, 800-801, which interprets that statute, the sentence is deemed to contain these restrictions. Therefore, no action is required to address this error. State v. Perkins, 02-502 (La.App. 5 Cir. 10/29/02), 831 So.2d 455, 459, writ denied, 02-3173 (La.9/26/03), 854 So.2d 348.
In accordance with the above, we affirm defendant's conviction and remand this matter for a ruling on defendant's motion to reconsider sentence.
CONVICTION AFFIRMED; MATTER REMANDED.
NOTES
[1] The record does not reflect that the motion to reconsider sentence was ever ruled upon. See discussion under Assignment of Error Number Two.
[2] Doyle v. Ohio, 426 U.S. 610, 620, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] In their briefs, defendant's appellate counsel and defendant pro se both state that the motion to reconsider sentence was filed and denied; however, as was stated previously, no ruling could be found in the record.
[5] LSA-C.Cr.P. art. 461 provides that the term "indictment" includes affidavit and information, unless it is the clear intent to restrict that word to the finding of a grand jury.