779 So.2d 840 (2000)
STATE of Louisiana, Appellee,
v.
Christopher R. ARNOLD and Derrick Garror, Appellants.
No. 34,194-KA.
Court of Appeal of Louisiana, Second Circuit.
December 6, 2000.
*842 Carey J. Ellis, III, Abita Springs, Counsel for Appellants.
Richard Ieyoub, Attorney General, William R. Coenen, Jr., District Attorney, Penny Doucier, Thomas Allen, Assistant District Attorneys, Counsel for Appellee.
Before GASKINS, KOSTELKA and DREW, JJ.
KOSTELKA, J.
The state originally charged Christopher Arnold ("Arnold") and Derrick Garror ("Garror") with possession of marijuana with intent to distribute and conspiracy to distribute marijuana. Following the denial of their motions to suppress confessions and physical evidence, Arnold and Garror (collectively referred to as "defendants") pled guilty to the conspiracy charge, reserving their rights under State v. Crosby, 338 So.2d 584 (La.1976) to challenge the denial of the motions on appeal. The court sentenced each defendant to five years at hard labor and denied subsequent motions for reconsideration of sentence. On appeal, defendants argue that their motions to suppress should have been granted and that the sentences imposed are excessive. We affirm.

FACTS
On July 9, 1998, State Trooper John Neal ("Neal") made a traffic stop of a Chevrolet Suburban ("Suburban"), bearing Alabama license plates, which was eastbound on I-20 in Lincoln Parish, Louisiana, after he saw the vehicle cross the fog line several times. Another vehicle with Alabama license plates, which appeared to be accompanying the Suburban, proceeded east down I-20. The driver of the Suburban, Garror, had no driver's license. Arnold, who claimed to own the vehicle, was *843 in the front passenger seat; he possessed a driver's license. Neal ran a criminal background check and discovered that both defendants had narcotics histories. Arnold consented to a search of the vehicle which disclosed a wallet belonging to an individual named Elmer Jack Bailey and about $1,000 in cash. Neal ran a criminal background check on Elmer Jack Bailey and learned that he also had a previous narcotics violation. State Trooper Chris Jordan ("Jordan") overheard Neal's radio conversations and joined Neal at the location of the stop. Neal released defendants without issuing any citation.
Neal then radioed to Trooper Jack Coleman ("Coleman") to be on the lookout for the other car, describing it specifically as a maroon Ford Escort ("Escort"), driven and occupied by one black male, having an Alabama tag beginning with the number "2." Neal informed Coleman that he believed the Escort contained contraband and would be driven by an individual named Elmer Jack Bailey. He also suggested that "[I]f [Coleman] had a chance to see it, if it committed a violation, [Coleman] might want to check it out."
Coleman observed the Escort following another vehicle too closely on I-20 east of Neal's location and made a traffic stop. The driver identified himself as Eric Garror and presented Coleman with a driver's license bearing that name. When "Garror" opened the passenger side door to get the car rental papers, Coleman detected the odor of marijuana. After the nervous driver signed a consent to search, Coleman searched the car and found a shopping bag filled with marijuana in the trunk. "Garror" was placed under arrest; while booking "Garror," the police determined he was actually Elmer Jack Bailey ("Bailey").
The state police again began looking for the Suburban. Senior Trooper Scott Easley ("Easley"), through radio transmissions of Neal and Coleman, was made aware that the occupants were involved in a conspiracy with Bailey. Easley observed the Suburban as it passed through Monroe, Louisiana and followed it eastward into Richland Parish while waiting for backup to join him because he was in an unmarked car. After another officer, Harvey Robideaux ("Robideaux"), joined Easley, the two made a traffic stop near Start, in Richland Parish, Louisiana. Simultaneously, Neal and Jordan arrived at the scene and arrested defendants. As the result of a subsequent search of the Suburban, the police officers seized $7,020 which was divided into seven bundles of cash and was in a back pack in the rear of the Suburban.
At police headquarters, Bailey stated that he had been paid $500 by defendants to drive a rental car to Fort Worth, pick up the marijuana, and drive back home to Mobile, Alabama. Defendants instructed Bailey to drive the car to a Fort Worth hotel where he met with them. Defendants provided him with a hotel room for the night and awakened him early in the morning. After breakfast, defendants told Bailey that the marijuana was in the car and that it was time to travel back to Mobile. Garror told officers the money in the Suburban was his from a maritime injury settlement and that the three men had gone to Fort Worth to buy marijuana and split it between himself and Arnold. Arnold denied knowledge of the marijuana.

DISCUSSION

Initial Suburban Stop
The defendants first argue that the initial stop was unlawful because there was no reasonable suspicion that the Suburban committed a traffic violation by touching the fog line because it did not leave its lane of travel.
La. R.S. 32:79(1) requires that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane...." The right of law enforcement officers to temporarily detain and interrogate persons reasonably suspected of criminal activity is well established. Terry v. *844 Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The right to make an investigatory stop must be based upon reasonable suspicion to believe that the suspect has been, is, or is about to be engaged in criminal activity. State v. Jackson, 31-836 (La.App.2d Cir.03/31/99), 736 So.2d 967. Reasonable suspicion for an investigatory stop is something less than probable cause, but the officer must have "articulable knowledge" of particular facts which, in conjunction with reasonable inferences drawn therefrom, provide reasonable grounds to suspect the detainee of criminal activity. Id. Whether an officer has a reasonable suspicion to make an investigatory stop should be determined under the totality of the circumstances, in light of the officer's experience, training, and common sense. The officer's experience may be a consideration in ascertaining whether his inferences from the given facts were reasonable. Id. Indeed, to assess the validity of an investigatory stop, the critical inquiry focuses on the officer's knowledge at the time of the stop. State v. Branch, 30,733 (La.App.2d Cir.07/06/98), 714 So.2d 1277, writ denied, 98-2359 (La.01/08/99), 734 So.2d 1227.
In this case, Neal testified that at approximately 3:00 p.m., he observed both of the right side tires of the Suburban drift several times over the fog line onto the right shoulder. He thought that the driver may have been impaired or falling asleep at the wheel. Under these circumstances, we find that Neal clearly had an articulable, reasonable cause to believe the driver of the Suburban had committed a lane usage violation. Accordingly, this stop was valid.

Length of Suburban Detention
The defendants also urge that the first detention of the Suburban was illegal before Arnold consented to the search because the detention prior to consent lasted too long.
There is no bright-line rule for determining when a lawful detention lasts too long. Each instance must be assessed in view of the surrounding circumstances. State v. Bostic, 26,000 (La.App.2d Cir.05/04/94), 637 So.2d 591, writ denied, 94-1476 (La.10/14/94), 643 So.2d 159. The diligence of the police officers in pursuing a means of investigation likely to quickly confirm or dispel their suspicions should be considered. State v. Bostic, supra, citing, U.S. v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).
The defendants argue that the detention lasted approximately thirty-nine minutes, the time between the original stop of the Suburban at approximately 3:00 p.m. and the stop of the Escort at 3:39 p.m. However, the record before us fails to bear out this claim. While the exact time for each event of the stop is absent from the record before us, the Consent to Search form reveals that the consent to search the Suburban occurred at 2:52 p.m. Shortly thereafter, the driver of the Suburban was allowed to leave. After the Suburban was allowed to leave, Neal then advised Coleman to be on the lookout for the Escort. Neal testified that approximately thirty minutes from the time he notified Coleman, he got word that Coleman had stopped the Escort; the citation issued to Bailey indicates that the time was 3:39 p.m. From this evidence, it is apparent that the defendants would have been released from Neal's stop at approximately 3:09 p.m. Thus, from the time of consent until release of the vehicle, approximately seventeen minutes would have elapsed. Defendants have presented no evidence to show that an unreasonable amount of time elapsed between the time of the original stop and the execution of the Consent to Search form. Furthermore, we note that the FBI printout of the criminal records of Garror and Arnold, which were obviously generated as the result of Neal's verbal request, show print times between 2:54 and 2:57 p.m. With the verbal requests being made prior to the consent, and the printouts presumably generated within a short time after the verbal request, it is not unreasonable to conclude that the total *845 time consumed was quite minimal.[1] Moreover, Neal's testimony that he immediately asked Garror for a license or identification and then to follow him to his unit when Garror produced neither, shows the time between the initial stop and the criminal history check likewise to have been of short duration.
When a police officer detains a vehicle beyond the initial stop, he must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." U.S. v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); State v. Flowers, 441 So.2d 707, (La.1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984). In determining whether the officer has a reasonable suspicion of some separate illegal activity which justifies further detention, the totality of the circumstances must be taken into account. State v. Kalie, 96-2650 (La.09/19/97), 699 So.2d 879.
In this case, Neal determined that the driver had no license. Normal procedure required the officer to investigate further with a general history and driver's license check. Clearly, a request to consent was reasonable after the trooper learned of the prior narcotics activities, Garror's apparent lie about trying to buy a vehicle without identification, his visible nervousness, and his denial of traveling with anyone else even though the trooper saw two cars with Alabama license plates beginning with "2," which meant both were from the same Alabama county. These circumstances show that Neal possessed a particularized and objective basis for suspecting that the defendants were guilty of a criminal offense which justified the length of the detention. We, therefore, find no merit to defendants' argument.

Pretextual Traffic Stops
The defendants also contend that Neal's stop of the Suburban was a pretext to search the vehicle, based only on the facts that the Suburban and the Escort had out-of-state plates and were driven by black males. They also argue that the subsequent stop of the Escort was likewise pretextual because Neal's and Coleman's motivation was to investigate the alleged narcotics violation. We cannot agree.
The Federal and Supreme Courts have held that officers may make an initial traffic stop after observing a traffic infraction even if the purpose of the stop is to investigate for CDS violations. State v. Franklin, 31,068 (La.App.2d Cir.09/23/98), 719 So.2d 578, writ denied, 98-2982 (La.03/19/99), 739 So.2d 781, citing, Whren v. U.S., 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). See also, U.S. v. Castro, 166 F.3d 728 (5th Cir.1999), cert. denied, 528 U.S. 827, 120 S.Ct. 309, 145 L.Ed.2d 66.
The Louisiana Supreme Court has also made it clear that the determination of reasonable suspicion for an investigatory stop, or probable cause for arrest, does not rest on the officer's subjective beliefs or attitudes but turns on a completely objective evaluation of all the circumstances known to the officer at the time of the challenged action. State v. Landry, 98-0188 (La.01/20/99), 729 So.2d 1019; State v. Kalie, 96-2650 (La.09/19/97), 699 So.2d 879.
As we observed previously, the initial stop of the Suburban was based upon Neal's observation that the driver of the Suburban crossed the fog line several times. Clearly, his observation of a violation of La. R.S. 32:79(1) created a reasonable suspicion for the stop.
*846 Moreover, the stop of the Escort was based on Trooper Coleman's observation that the car was following another vehicle too closely. A traffic stop made on the basis of following too closely, a violation of La. R.S. 32:81, is a valid stop. State v. Shapiro, 98-1949 (La.App. 4th Cir.12/29/99), 751 So.2d 337.
Nor do Neal's comments to Coleman invalidate the stop of the Escort. In Castro, supra, officers of a joint state and federal task force conducted surveillance of an individual suspected of narcotics trafficking. After observing the suspect conducting suspicious activity, several members of the task force followed the vehicle that the suspect drove for approximately 115 miles. Thereafter, the officers contacted a local sheriffs officer, described the vehicle to him and informed him that it was "involved in a narcotics investigation." He was also instructed that he would have to "develop his own probable cause" for stopping the vehicle. The officer then observed that the driver of the vehicle was not wearing a seatbelt and was driving at an excessive rate of speed. He also observed that the passenger was not wearing a seat belt. The officer stopped the vehicle for traffic infractions and eventually arrested both the driver and passenger for seat belt violations. The vehicle was impounded and a trained narcotics dog detected 900 pounds of cocaine. On appeal, the court rejected the defendants' arguments that the impoundment and subsequent search of the vehicle were unreasonable because the officer's actions were motivated by his suspicion that the defendants were engaged in drug trafficking when there was no probable cause to that effect. Notably, the defendants, in Castro, conceded, pursuant to Whren, supra, that the officer's subjective beliefs had no bearing on the legality of the initial stop of the vehicle.
Based upon this jurisprudence, we find that Coleman made a valid stop based upon his observation of a traffic violation, regardless of his subjective beliefs and motivation regarding drugs. Moreover, his routine registration check, which resulted in the troopers detecting the odor of marijuana, created probable cause to search. Defendants' argument has no merit.

Second Stop of Suburban
Finally, defendants argue that the officers had no reasonable suspicion to stop the Suburban a second time because the stop was based upon Easley's knowledge of Neal's "hunches" about the criminal conspiracy of the defendants.
We cannot agree. Neal had knowledge that the Suburban and the Escort were traveling together based on their similar licensing and the Escort's driver's possession of a driver's license issued in the name of Garror, as well as Garror's possession of a driver's license issued to Bailey. The troopers also knew that the Escort was transporting a load of marijuana, that the defendants in the Suburban possessed a large sum of money and that they had narcotics backgrounds. Based upon this knowledge, Neal requested that officers patrolling eastbound I-20 be on the lookout for the Suburban. With this request, and his general understanding that the Suburban was involved in a narcotics conspiracy, Easley, with the assistance of Robideaux, stopped the Suburban just as Neal and Jordan arrived at the scene.
Under these circumstances, we find that not only was it reasonable for the police to believe that the Escort's driver's traveling companions had knowledge of the marijuana, i.e., that they had a reasonable belief that an offense was being committed, but that the officers also had probable cause to stop the vehicle for arrest of the defendants. La.C.Cr.P. art. 213. We reject this argument as well.

Excessive Sentence
The defendants urge that the five-year sentences are excessive because the trial court failed to consider as a mitigating circumstance that both defendants showed remorse and accepted responsibility *847 for their actions. Defendants also point to their relative youth as mitigating factors.
After reviewing the trial court's articulation of reasons and the sentences imposed in accordance with the jurisprudential analysis set forth in State v. McKinney, 31,611 (La.App.2d Cir.02/24/99), 728 So.2d 1009, we affirm the sentences.
Prior to imposing sentence, the district court reviewed a presentence investigation report. Arnold, age thirty-three at the time of sentencing, was a first felony offender. The court reviewed the facts of the case and noted that Arnold had apologized for being involved in this conspiracy but declined to make a written statement. Arnold had arrests in Alabama in 1992, without dispositions, for possession of marijuana, possession of paraphernalia and possession of cocaine with intent. In 1994, Arnold was arrested for possession of crack cocaine, possession of marijuana, second offense, and no gun permit. The charges were reduced to possession of paraphernalia, a misdemeanor to which Arnold pled guilty and was sentenced in 1995 to three months and two years' probation. The court discussed Arnold's family background and circumstances, his school record and his employment history, noting that he had one child but had never married the mother who has custody, although he provides some financial support.
Defendant Garror, age twenty-eight at the time of sentencing, was also a first felony offender. He had a juvenile arrest for possession of crack cocaine. He was arrested in Alabama in 1992 for possession of CDS and in 1995 for possession of cocaine, without disposition. The court discussed his family background, his schooling, and his work history. Although never married, Garror had two children by two different women who have custody. He pays no child support. Defendant denied he had been arrested in 1995.
As to both defendants, the court found an undue risk of further criminal acts if granted probationary sentences. The court found a need for correctional custody and that a lesser sentence would deprecate the seriousness of the offense. Both had previous drug-related offenses. They acted as leaders in the conspiracy with the "so called mule" who had been driving the second car. This was a major offense, economically, and posed a threat to the community. There was no justification or excuse for their conduct.
This articulation demonstrates adequate La.C.Cr.P. art. 894.1 compliance. Nor do we find the sentences imposed to be constitutionally excessive.
These mature defendants directed the transporting of approximately thirty pounds of marijuana. Each received a substantial reduction in sentencing exposure through the state's agreement to dismiss the possession with intent to distribute charges. Clearly, the pled offenses do not adequately describe the defendants' conduct. Moreover, the sentencing range for the crime of conspiracy to distribute marijuana is two-and-one-half to fifteen years. Even with the defendants' first felony status and expressions of remorse, we cannot find that these low-range sentences are either excessive or shocking. This assignment is without merit.

CONCLUSION
For the above reasons, we affirm the defendants' convictions and sentences.
AFFIRMED.
NOTES
[1] The defendants' reliance on State v. Bunnell, 517 So.2d 439 (La.App. 1st Cir.1987) in support of their position is misplaced. There, although the appellate court held that a thirty-minute detention for a traffic stop for a minor violation was improper, the arresting police officer had purposefully withheld issuing a traffic citation solely for the purpose of obtaining a consent to search based on a general suspicion fueled by the driver's nervousness and being from out of state. We find these facts distinguishable from the present case.