STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

11-794

STATE OF LOUISIANA

VERSUS

CARLOS RIOS CORTES

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 09-236763
HONORABLE CHARLES LEE PORTER, DISTRICT JUDGE

**********

JAMES T. GENOVESE
JUDGE

**********

Court composed of Oswald A. Decuir, Billy Howard Ezell, and James T. Genovese, Judges.

AFFIRMED WITH INSTRUCTIONS.

J. Phil Haney
**District Attorney – Sixteenth Judicial District**
**Angela B. Odinet – Assistant District Attorney**
**St. Martin Parish Courthouse**
**307 Church Street**
**St Martinville, Louisiana 70582**
**(337) 394-2220**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

**Mark Owen Foster**
**Louisiana Appellate Project**
**222 Adelaide Street**
**Post Office Box 2057**
**Natchitoches, Louisiana 71457**
**(318) 572-5693**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Carlos Rios Cortes**

**GENOVESE, Judge.**

In this criminal case, Defendant, Carlos Rios Cortes,[1] was found guilty by jury verdict of attempted possession of heroin in the amount of 400 grams or more and was sentenced to serve fifteen years at hard labor. He appeals, alleging insufficiency of the evidence, trial court error in denying his Motion to Suppress, and trial court error in not granting his pro se Motion for New Trial. For the following reasons, we affirm Defendant's conviction with instructions pertaining to post conviction relief.

## FACTS AND PROCEDURAL HISTORY

On July 7, 2009, at approximately 8:17 a.m., Vonita Cisneros was driving her 2001 Mitsubishi Montero eastbound on Interstate Highway 10 (I-10) within St. Martin Parish, Louisiana, when she was stopped by a Louisiana State Trooper for following too closely. Defendant was the only passenger in the Cisneros vehicle. Ms. Cisneros and Defendant are of the Hispanic race. I-10, at the time, was experiencing very wet road conditions and very heavy work traffic. After questioning both Ms. Cisneros and Defendant, the state trooper obtained written consent from Ms. Cisneros to search her vehicle. The search produced six pounds, over 400 grams, of heroin hidden in a rear panel of the vehicle. Both Ms. Cisneros and Defendant were charged with possession of over 400 grams of heroin, in violation of La.R.S. 40:966(D)(1)(c).

On November 16, 2009, Defendant filed a Motion to Suppress, alleging that the evidence was illegally seized. On April 6, 2010, Defendant filed a second Motion to Suppress,[2] alleging that both the stop and the search leading to the

---

[1] The spelling of Defendant's name appears as "Cortes" and "Cortez." For purposes of this opinion, he will be referred to as "Cortes."

[2] This pleading was clearly written for Defendant's co-defendant and relabeled for Defendant as it refers to Defendant as "she" and as the driver of the vehicle. The record shows that Defendant is male and was the passenger in the automobile.

collection of evidence were unconstitutional because they were done without reasonable suspicion or probable cause.

Following a trial by jury on April 29, 2010, Defendant was found guilty of attempted possession of heroin in the amount of 400 grams or more, in violation of La.R.S. 14:27 and La.R.S. 40:966(D)(1)(c). On June 9, 2010, the trial court received a pro se letter from Defendant; the missive was written in Spanish. Thereafter, on June 15, 2010, Defendant appeared in court for sentencing, and the trial court ordered him to serve fifteen years at hard labor. Defendant now appeals his conviction only.

## ASSIGNMENTS OF ERROR

Defendant presents the following three assignments of error:

ASSIGNMENT OF ERROR NUMBER ONE:  The trial court was in error to deny Mr. Cortez' [sic] motion to suppress evidence.

ASSIGNMENT OF ERROR NUMBER TWO:  It was error patent for the trial court not to have considered Mr. Cortez' [sic] *pro se* filing as a motion for new trial.

ASSIGNMENT OF ERROR NUMBER THREE:  The evidence was insufficient to convict Mr. Cortez [sic] of the crime of attempted possession of over 400 grams of heroin.

## DISCUSSION OF THE RECORD

Trooper David Speyrer with the Louisiana State Police (LSP) was the State's first witness.  He testified that he had over eight years of experience with the LSP. Trooper Speyrer was working on July 7, 2009, and came into contact with Defendant while on duty.  Ms. Cisneros' vehicle was the first car Trooper Speyrer stopped after beginning his shift.  This occurred at 8:17 a.m.  Defendant was a passenger in the Cisneros vehicle.  Trooper Speyrer stated, "The roadway was very wet.  I saw a white Mitsubishi Montero traveling eastbound on I-10 in the inside

lane directly behind a small passenger car.  At that time of the morning[,] it was heavy work traffic."

Trooper Speyrer explained that he observed the car committing a traffic violation at milepost 109 in St. Martin Parish by the Breaux Bridge scale house and that he caught up with the car near milepost 111.  He ran the Pennsylvania license plate on the car, found out that it had not been reported stolen, and initiated the traffic stop between milepost 111 and milepost 112.

Trooper Speyrer reported that the driver of the vehicle had been following two to three car lengths behind the car ahead of it and that this was dangerous because of the "very wet" road conditions and heavy traffic.  Trooper Speyrer asked the driver to present her driver's license and informed her as to why she had been pulled over.  The driver's license presented was a North Carolina license that identified the driver as Vonita Cisneros.  Ms. Cisneros stated that she was traveling from Houston.

Trooper Speyrer noted that while he was asking Ms. Cisneros questions, she did not look him in the eye, she looked away a lot, and her hands trembled.  When Trooper Speyrer asked Ms. Cisneros about the passenger in her car, she stated that he was her husband, Carlos, and that they had been together for two years.

Trooper Speyrer related that he also spoke with Defendant, who was the passenger of the car:

> I walked over onto the passenger side, while she stood in front of my unit, and I greeted him by shaking his hand.  At that moment, I noticed when he shook my hand, his right palm of his hand was soaking wet with sweat.  I also immediately noticed he was nervous due to [his] carotid artery . . . pulsating in his neck.  It's very obvious, because where I'm standing, I'm right near the door, standing right next to the side mirror[,] and you can see the nervous in somebody[;] it's just like a popping in the neck on the skin.  And that's usually, from my experience, an indication of extreme nervousness.

Trooper Speyrer requested Defendant's identification, and Defendant handed him a Mexican National Identification Card. He asked Defendant if he spoke English, and Defendant indicated he spoke some English. Defendant informed Trooper Speyrer that he was coming from Dallas. This is significant because Ms. Cisneros said they were coming from Houston and because Texas is a source state for illegal drugs. While questioning Defendant, Trooper Speyrer also noticed a strong chemical odor emanating from the vehicle's interior. Trooper Speyrer stated he was not used to smelling that type of odor in vehicles and that strong-smelling chemicals can sometimes be used to mask other smells, such as those exuded by contraband.

Trooper Speyrer testified that the conflicting answer given by Defendant and the strong chemical odor emanating from the car aroused his suspicions. He returned to Ms. Cisneros and questioned her further before going to his unit and checking their criminal histories. While he waited for that information to be relayed, Trooper Speyrer requested consent to search the vehicle. The consent to search form was dated July 7, 2009, and showed the time as 8:38 a.m. and a location of I-10 eastbound at milepost 113. The consent form further showed that Vonita Cisneros, a resident of North Carolina, authorized Trooper Speyrer to search a 2001 Mitsubishi Montero bearing Pennsylvania license plate number HCC644 and to seize any items the LSP deemed pertinent to its investigation. Trooper Speyrer witnessed Ms. Cisneros signing the form. The consent form showed the time of the stop as 8:17 a.m. and listed the time of arrest of both occupants as 8:58 a.m. The bottom of the form had a Spanish translation for non-English speaking people.

Trooper Speyrer stated that he had been involved in making narcotics arrests since 1997 and had received training in narcotics criminal interdiction, which

included schools and classes, and that this training included education about indicators or points of interest showing that a particular driver may be involved in criminal activity. He related that he had been involved in twenty car-related narcotics arrests during 2009 and that it was common for two people to occupy a vehicle containing large quantities of narcotics.

Trooper Speyrer testified that, upon searching the vehicle, officers discovered concealed compartments on both the driver's side and passenger's side that contained contraband. The alterations to the vehicle were aftermarket and made after its sale from a dealership. The contraband consisted of three packages of heroin; it field-tested positive, and the results were confirmed. The heroin weighed six pounds. Trooper Brad Guidroz seized the heroin on behalf of law enforcement.

On cross-examination, Trooper Speyrer agreed that some people become nervous when pulled over by a police officer, but, sometimes, that nervousness abates, and the person calms down. He further stated that nervousness exhibited by Ms. Cisneros' hands shaking and her avoiding eye contact, by itself, was not an indicator; however, when he considered the nervousness with the other points of interest he observed as the traffic stop progressed, he became suspicious. Trooper Speyrer related that the amount of nervousness Defendant displayed during the stop was unusual and that passengers are not normally that nervous during traffic stops.

Trooper Speyrer recalled that, as he filled out the consent form and inquired about Ms. Cisneros' and Defendant's criminal histories, it began to drizzle. Consequently, they moved a mile from their original location to get underneath the Bordelon Road overpass. Once there, after he explained the consent form to her, Ms. Cisneros readily agreed to the search and voluntarily signed the consent form.

5

Trooper Guidroz with the LSP was the second witness to testify. He stated that he had been employed with LSP for four years, had worked in the narcotics division for the two years prior to trial, and had been assigned to handle the evidence in Defendant's case. Trooper Guidroz seized packages of heroin weighing 2.74 kilograms, 2,740 grams, or approximately six pounds. The crime lab report subsequently showed that samples taken from each of the packages were heroin. On cross-examination, Trooper Guidroz testified that the packages of heroin were neither fingerprinted nor tested for DNA evidence.

Agent Vernon Bison, employed by Immigration and Customs Enforcement for the eight years prior to trial, was the State's third witness. He interviewed Defendant in the presence of Agent Joseph Lopez as well as a translator, Officer Robinson Olivero.[3] Through Officer Olivero, Defendant was *Mirandized* (read his rights) in Spanish prior to the interview. On cross-examination, Agent Bison stated that both Cisneros and Cortes denied knowledge of the heroin in the vehicle.

Officer Olivero, with the Lafayette Police Department, testified that he had worked with the Lafayette Police Department for thirteen and one-half years, that Spanish was his first language, and that translating between English and Spanish was one of his duties as a police officer. He stated that he always began his interviews by advising the subject of his *Miranda* rights in Spanish.

Officer Olivero testified that he did the translation during Agent Bison's interview of Defendant on July 9, 2009. At the time, Defendant was shown a *Miranda* rights card containing the advisement of rights in both Spanish and English. Defendant stated that he understood. Officer Olivero further testified that

---

[3]The transcripts in the record also spell Officer Olivero's last name as "Olivera." We shall use the spelling Officer Olivero put in the record during the suppression hearing.

Defendant did not appear to be under any pressure during the interview and that he was neither coerced nor restrained in order to have him participate in the interview.

Officer Olivero recalled that Defendant made several statements during the interview. Defendant said that his girlfriend, Ms. Cisneros, and her mother and brother, were involved in selling narcotics. Defendant related that Ms. Cisneros knew about the drugs in the vehicle. During the interview, Defendant also stated that a man named Esteban Esfino had told him there was marijuana in the automobile. Defendant never indicated or stated that he did not understand what was going on.

The State's fifth witness was Trooper Justin Bertrand with the LSP. Trooper Bertrand learned Spanish while attending school in France near its border with Spain. Trooper Bertrand interviewed Defendant on July 7, 2009. After establishing that Defendant would rather be interviewed in Spanish than English, Trooper Bertrand read Defendant his *Miranda* rights in Spanish, and Defendant signed the form. Trooper Bertrand and Trooper Walter Mire witnessed Defendant's signature. There was a video recording made of the July 7, 2009, interview. Trooper Bertrand stated that he saw Trooper Mire count the money in Defendant's wallet during the video interview.

During the interview, Defendant never said that he was having difficulty understanding. He claimed to have ridden to Houston with Esteban Esfino. When Ms. Cisneros, Defendant's fiancée, had to return home to North Carolina for work, Mr. Esfino decided to remain in Houston, but to allow Defendant and Ms. Cisneros to drive his vehicle back to North Carolina. Defendant denied having knowledge that the drugs were in the automobile.

Trooper Mire was called as the prosecution's last witness. He testified that he had worked for the LSP for eight years, that he had been investigating narcotics

7

cases for five years, that his primary duties were narcotics investigations, that he had personally handled approximately 150 narcotics investigations during that time, and that he had investigated Defendant's case. Trooper Mire further testified that he was present for Defendant's July 7, 2009 interview and witnessed Trooper Bertrand read Defendant his *Miranda* rights in Spanish. He also signed the *Miranda* form in his capacity as a witness and counted the money in Defendant's wallet ($915.00 in cash) during the interview.

Trooper Mire stated that the wholesale value of the heroin seized in the instant case was $450,000.00 and that the drugs were wrapped in grease, tape, and carbon paper. There was no attempt to fingerprint the packages because those materials, by their nature, would have made obtaining clear fingerprints difficult. The grease was used as a ploy to disguise the smell of the heroin.

### ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find two errors patent.

First, the trial court failed to delay sentencing for twenty-four hours after it denied Defendant's Motion for Post Verdict Judgment of Acquittal and Alternative Motion for a New Trial. Louisiana Code of Criminal Procedure Article 873 requires a twenty-four-hour delay between the denial of a motion for new trial or a motion in arrest of judgment and the imposition of sentence. Because Defendant does not argue excessiveness of his sentence on appeal and does not claim he was prejudiced by the lack of delay, this error is harmless. *State v. Roberson*, 06-1568 (La.App. 3 Cir. 5/2/07), 956 So.2d 736, *writ denied*, 07-1243 (La. 12/14/07), 970 So.2d 531; *State v. Boyance*, 05-1068 (La.App. 3 Cir. 3/1/06),

8

924 So.2d 437, *writ denied*, 06-1285 (La. 11/22/06), 942 So.2d 553; and *State v. Shepherd*, 02-1006 (La.App. 3 Cir. 3/5/03), 839 So.2d 1103.

Second, the trial court failed to properly advise Defendant of the time limitation for filing an application for post-conviction relief. At sentencing, the trial court stated:

> The sentence will become final in thirty (30) days. . . . That's not to say that the [c]ourt believes that any error has been committed, but if the [D]efendant or anyone on his behalf believe[s] or allege[s] that an error occurred[,] then it must be filed within that two-year period or the [D]efendant will lose the right to complain of any error thereafter.

Louisiana Code of Criminal Procedure Article 930.8 provides that [D]efendant has two years *after the conviction and sentence become final* to seek post-conviction relief. Accordingly, we instruct the trial court to inform Defendant of the correct provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within fifteen days of the rendition of this opinion and to file same in the record of these proceedings. *State v. Roe,* 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

### **ASSIGNMENT OF ERROR NUMBER THREE**[4]

Defendant claims, "The evidence was insufficient to convict Mr. Cortez [sic] of the crime of attempted possession of over 400 grams of heroin." Defendant complains that the evidence presented at trial did not show that he, as a passenger, had any knowledge that there was heroin hidden in the car. He maintains that, because he was a passenger in the car and because the drugs were hidden within the structure of the car, there was no direct evidence that he possessed or attempted to possess the drugs. Defendant argues that his statement during his police interview should not be considered because Officer Olivero did not specifically

---

[4]"When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence." *State v. Hearold*, 603 So.2d 731, 734 (La.1992).

remember *Mirandizing* him and because Officer Bison testified that Defendant denied knowing drugs were in the car. Defendant asks this court to vacate his conviction.

The State replies that there was sufficient evidence to support Defendant's conviction as the evidence showed that Defendant was a passenger in the car and that he was aware that there were drugs in the car.

The Louisiana Supreme Court has discussed the standard of review for evaluating the sufficiency of the evidence on appeal:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

> [The supreme court has] repeatedly cautioned that due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law."

*State v. Calloway*, 07-2306, p. 10 (La. 1/21/09), 1 So.3d 417, 422 (citations omitted). "The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness[.]" *State v. Higgins*, 03-1980, p. 17 (La. 4/1/05), 898 So.2d 1219, 1232, *cert. denied*, 546 U.S.

883, 126 S.Ct. 182 (2005). "Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007).

It is prohibited to possess a Schedule I substance without a valid prescription:

> Possession.  It is unlawful for any person knowingly or intentionally to possess a controlled dangerous substance classified in Schedule I unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner or as provided in R.S. 40:978, while acting in the course of his professional practice, or except as otherwise authorized by this Part.

La.R.S. 40:966(C).  A person may be in violation of La.R.S. 40:966(C) through either actual or constructive possession:

> [T]he mere presence of a defendant in an area where narcotics are discovered is insufficient to support a finding of possession.  What must be shown is that each defendant had a direct right and ability to exercise control.  The prosecutor does not need to show that a defendant was in actual possession of the illegal substance in order to convict; proof of constructive possession is sufficient.  In order to convict a person on the basis of constructive possession, something more than mere presence in the area where the drug is found or mere association with the person in actual custody of the drug must be shown.  A person may be in constructive possession of an illegal substance, even though not in physical possession, if it is subject to his dominion and control.  A person may be deemed to be in joint possession of a drug which is in the physical custody of a companion if he willingly and knowingly shares with the other the right to control it.  Besides showing that a defendant had a direct right and ability to exercise control, the prosecutor must show guilty knowledge.  Several factors to be considered in determining whether a defendant exercised "dominion and control" over narcotics in order to constitute constructive possession are as follows:
>
> > ". . . a defendant's knowledge that illegal drugs are in the area; the defendant's relationship with the person found to be in actual possession; the defendant's access to the area where the drugs were found; the evidence of recent drug use by the defendant; the defendant's physical proximity to the drugs; and any evidence that the area was frequented by drug users."

*State v. Reynaga*, 93-1520, pp. 8-9 (La.App. 3 Cir. 10/5/94), 643 So.2d 431, 436 (quoting *State v. Tasker*, 448 So.2d 1311, 1314 (La.App. 1 Cir.), *writ denied*, 450 So.2d 644 (La.1984))(citations omitted).

Heroin is listed as a Schedule I controlled dangerous substance. La.R.S. 40:964. It is also illegal to attempt to possess a Schedule I substance without a valid prescription:

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

La.R.S. 14:27.

The evidence most favorable to the prosecution shows that Defendant admits he was aware that he was riding in a vehicle transporting illegal drugs. Defendant's guilty knowledge was supported by his display of nervous behavior during the traffic stop and his statement that he was aware of the fact that drugs were in the vehicle. Trooper Speyrer stopped the vehicle as it traveled along a known drug corridor, and a search of the vehicle revealed heroin concealed in a custom-made compartment in the car, which gave Defendant and his fiancée equal access to the drugs.

We find that the facts in this case are sufficient to support Defendant's conviction for attempting to possess CDS I (heroin) over 400 grams. Accordingly, this assignment of error is without merit.

### ASSIGNMENT OF ERROR NUMBER ONE

Defendant argues, "The trial court was in error to deny Mr. Cortez' [sic] motion to suppress evidence." He asserts that he has the right to be free from a wrongful stop, from detention, and from self-incrimination. Defendant claims that the trooper had no objective basis to support his suspicion that the car was engaged

in criminal activity, that he was stopped as a result of racial profiling, that his stop and everything that followed was illegal, that he was not fully advised of his *Miranda* rights, and that his conviction should be overturned. Defendant adds that, after he was arrested, he was improperly questioned because he had not been fully advised of his *Miranda* rights.

In his motion to suppress, Defendant alleged that the video of the traffic stop did not support a finding that the vehicle he was riding in had been engaged in following too closely, in violation of La.R.S. 32:81, because, at the time of the stop, there were no automobiles near his co-defendant's car. Defendant further contended that his co-defendant did not act in a suspicious manner or give answers that would arouse reasonable suspicion. Defendant also complained about the length of the traffic stop, that it should have been concluded after the trooper gave the driver a warning about following too close, and that the driver's consent to search the vehicle did not dissipate the taint of the Fourth Amendment violation.

### STANDARD OF REVIEW

This court has determined that the proper standard of review for examining mixed questions of fact and law on a motion to suppress is abuse of discretion:

> When a trial court rules on a defendant's motion to suppress, the appellate court must look at the totality of the evidence presented at the hearing on the motion to suppress. The appellate court should not overturn a trial court's ruling, unless the trial court's conclusions are not supported by the evidence, or there exists an internal inconsistency in the testimony of the witnesses, or there was a palpable or obvious abuse of discretion.

*State v. Bargeman*, 98-617, p. 5 (La.App. 3 Cir. 10/28/98), 721 So.2d 964, 967, *writ denied*, 99-33 (La. 5/28/99), 743 So.2d 658. The State bears the burden of proving the admissibility of evidence seized without a warrant. La.Code Crim.P. art. 703(D). "In determining whether the ruling on a motion to suppress was correct, the court is not limited to the evidence adduced at the hearing on the

13

motion, but may consider all pertinent evidence given at the trial of the case." *State v. Williams*, 04-1309, pp. 21-22 (La.App. 5 Cir. 4/26/05), 902 So.2d 485, 499, *writs denied*, 05-1640 (La. 2/3/06), 922 So.2d 1173, 924 So.2d 144.

## *EVIDENCE PRESENTED AT THE SUPPRESSION HEARING*

The trial court conducted a hearing on Defendant's motion to suppress on April 14, 2010. Trooper Speyrer was the first witness to testify at the suppression hearing, and he testified that he came into contact with Defendant while working on July 7, 2009. He stated that Defendant was the passenger in a white Mitsubishi Montero with a Pennsylvania license plate that he pulled over by milepost 112 where I-10 passed through St. Martin Parish, that it had been raining, and that he first saw the Mitsubishi at milepost 109. Trooper Speyrer noted that the Mitsubishi vehicle was traveling two or three car lengths behind another vehicle, that this was an unsafe distance, and that operating a vehicle in such a manner (considering the road conditions) constituted a violation of following too closely.

Trooper Speyrer related that the Mitsubishi vehicle pulled over at milepost 112, and he asked the driver to step out of the vehicle. The driver handed him a North Carolina driver's license that identified her as Vonita Cisneros. Ms. Cisneros told him that they were traveling from Houston where they had spent the Fourth of July weekend. Ms. Cisneros stated that the passenger in her vehicle was her husband, Carlos, and that the vehicle belonged to her father. Trooper Speyrer stated that while speaking with him, Ms. Cisneros barely made eye contact with him and that her right hand, which was holding the vehicle registration, was shaking. He checked the paperwork and saw that the Mitsubishi was registered to Javier Alvoto Soto and had recently been purchased with registration issued June 29, 2009. Ms. Cisneros stated that she and Defendant had been together for two years and that they were driving home to North Carolina.

Trooper Speyrer said, when he then walked over to the passenger window to speak with Defendant, he shook Defendant's hand and noticed that Defendant's hand was soaking wet with sweat. This drew Trooper Speyrer's attention because, normally, the passenger in a vehicle will be less nervous than the driver. Trooper Speyrer also noticed that he could see Defendant's carotid artery pulsing in his neck. Defendant turned over his Mexican National Identification Card bearing his name and picture, and Trooper Speyrer began questioning him in a mix of Spanish and English. Defendant said he was coming from Dallas and traveling to North Carolina. Defendant said the name on the vehicle registration was "familia"; but, when asked if it was Ms. Cisneros's father, Defendant said "no" and that he did not know. This was suspicious to Trooper Speyrer because they purported to have been in a relationship for two years. Trooper Speyrer then stated that he noticed a chemical odor emanating from the vehicle as he spoke to Defendant.

Trooper Speyrer testified that he returned to his unit to check the validity of Ms. Cisneros's driver's license and request a criminal history. His primary objective was not to issue citations; instead, it was to interdict criminal activity. While waiting for the criminal history, Trooper Speyrer prepared a consent to search form for the Mitsubishi. After exiting his unit, he approached Ms. Cisneros, gave her license and registration back to her, and informed her that he was going to give her a verbal warning for the violation.

After warning Ms. Cisneros about the traffic violation, he asked her if there was anything illegal in the vehicle. She said "no." Trooper Speyrer asked if it was okay for him to search the automobile since there was nothing illegal in there, and Ms. Cisneros gave verbal consent. Trooper Speyrer presented the consent form to Ms. Cisneros and watched as she signed the form both in the English and Spanish sections. He then signed both sections as a witness to the consent with the form

15

indicating the time as 8:38 a.m. Once he had consent, Trooper Speyrer requested the assistance of other troopers. He explained that the troopers work in teams on the interstate for safety purposes. Trooper Troy Dupuis was the first trooper to arrive at the scene, and Senior Trooper Brooks David arrived shortly thereafter.

Trooper Speyrer recalled that the rain had become heavier, so he asked Ms. Cisneros to move her vehicle under the next overpass; she complied. Once the car was out of the rain, the troopers searched the vehicle. During the search, one of the troopers discovered packages secreted in one of the vehicle's natural voids. The troopers immediately arrested and read *Miranda* rights to both Defendant and Ms. Cisneros before attempting to determine what was in the packages. The contents of the packages field-tested positive for heroin, weighing 6.02 pounds.

On cross-examination, Trooper Speyrer stated that it took approximately twenty-one minutes from the stop of the vehicle through search of the vehicle and that that amount of time exceeded the amount of time it would normally take to issue a traffic citation and let the motorist go with just the citation.

Trooper Bertrand was the second witness to testify at the suppression hearing. Being fluent in Spanish, Trooper Bertrand was called upon to act as a translator during the subsequent interview of Defendant. Trooper Bertrand advised Defendant of his *Miranda* rights in Spanish and witnessed him signing the rights form. Defendant indicated that he understood his rights and wished to waive them. Defendant was not threatened, put under duress, or deprived of food or anything else in order to obtain the statement. On cross-examination, Trooper Bertrand stated that Defendant denied having anything to do with the drugs and made no inculpatory statements during the interview.

Agent Bison, with Immigration and Customs Enforcement, was the State's third witness at the suppression hearing. Agent Bison, Agent Lopez, and Officer

16

Olivero interviewed Defendant on July 9, 2009. Before the interview, Officer Olivero read Defendant his *Miranda* rights in Spanish using Agent Bison's rights card, and both Agent Bison and Agent Lopez witnessed the advisement of rights.

Agent Lopez, also with Immigration and Customs Enforcement, testified as the prosecution's fourth witness at the suppression hearing and stated that he witnessed Officer Olivero read Defendant his *Miranda* rights.

Officer Olivero testified as the State's next witness. He explained that Spanish was his first language and that he participated in the July 9, 2009 interview with Defendant. Officer Olivero began his translations by advising Defendant of his rights, and then he translated the questions asked and answers given. Defendant stated that he understood his rights.

After considering the evidence and arguments presented at the suppression hearing, the trial court denied relief, stating:

> THE COURT: All right. The [c]ourt is of the opinion that the Motion to Suppress should be denied[,] and the [c]ourt will deny the Motion to Suppress and admit the statements for the purpose of the request of the State to use it at trial and during Opening Statement.
>
> The [c]ourt finds that the stop by the Officer on . . . July 7th is not unreasonable or untenable under the circumstances. He starts out by talking about the weather conditions, the time and date, indicating that it was during the period of 8:00 a.m. in the morning, a period when a number of traffic -- traffic is high, persons -- people going to work, raining, moving the car from an uncovered situation to a covered situation under the underpass.
>
> The [c]ourt is aware of the jurisprudence that admonish[es] law enforcement of tardiness and [tarrying] . . . and, perhaps, having some other objectives in mind when they stop on a traffic stop.
>
> The [c]ourt believes that the Officer articulated reasonable suspicion to ask for consent to search and obtain the consent to search. The Officer does not have to be ninety percent correct. He doesn't have to be fifty percent correct. He simply has to articulate a reasonable suspicion[,] and the [c]ourt believes that the testimony establishes it.

17

*THE STOP*

Defendant objects to the state trooper being stationed on the roadside to watch for suspicious activity other than traffic violations. Defendant further complains that, upon having his suspicions aroused, the state trooper used a traffic violation as a pretextual basis for stopping the vehicle. Defendant asserts that officers are not allowed to stop vehicles on the basis of a hunch or a whim.

Defendant argues that the Equal Protection Clause prohibits race-based selective enforcement of the law; therefore, his stop was illegal because it was based on racial profiling and that similarly situated Caucasian motorists were not stopped. Defendant adds that the trooper also improperly relied on the couple originating from Texas, a source state for illegal drug traffic, as a suspicious circumstance. Defendant contends the fact that Defendant and his co-defendant were traveling as a pair was not a suspicious circumstance since "virtually everyone travels in pairs in a car at some time." Defendant also disagrees with the trooper's assessment that the vehicle having Pennsylvania plates while it was not being driven directly to Pennsylvania was a suspicious indicator since the trooper also acknowledged that, on the interstate, he had seen cars from all states traveling in all directions.

Based upon these arguments, Defendant maintains that there was insufficient objective information for the trooper to conclude that the couple was involved in suspicious criminal activity and that the evidentiary fruit of the stop should be suppressed.

The State responds by stating that the trooper observed the vehicle commit a ticketable offense; therefore, the stop was valid. The prosecution argues that there was no evidence that the trooper stopped the vehicle based upon the ethnicity of its

18

occupants. Moreover, once stopped, there was enough suspicious behavior to arouse the experienced officer's suspicions.

Law enforcement officers have the authority to stop anyone if the officers have a reasonable suspicion that that person committed a crime. "A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions." La.Code Crim.P. art. 215.1(A). This also applies to traffic stops:

> As a general matter, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996) (citations omitted). The standard is a purely objective one that does not take into account the subjective beliefs or expectations of the detaining officer. *Whren*, 517 U.S. at 813, 116 S.Ct. at 1774 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Although they may serve, and may often appear intended to serve, as the prelude to the investigation of much more serious offenses, even relatively minor traffic violations provide an objective basis for lawfully detaining the vehicle and its occupants.

*State v. Waters*, 00-356, p. 4 (La. 3/12/01), 780 So.2d 1053, 1056. Furthermore, "even if a stop is pretextual, the actual motives of the police are irrelevant if the police do 'no more than they would be authorized to do.'" *State v. Morris*, 03-269, p. 9 (La.App. 3 Cir. 9/10/03), 854 So.2d 989, 995, *writ denied*, 03-2853 (La. 10/15/03), 855 So.2d 743 (quoting *Waters*, 780 So.2d at 1056).

"A traffic stop made on the basis of following too closely, a violation of La. R.S. 32:81, is a valid stop." *State v. Arnold*, 34,194, p. 7 (La.App. 2 Cir. 12/6/00), 779 So.2d 840, 846. "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway." La.R.S. 32:81(A).

Therefore, regardless of any additional motives Trooper Speyrer may have had in stopping the vehicle, there was reasonable suspicion to stop the Mitsubishi based on the vehicle following too closely to another automobile considering the weather conditions, the wet pavement, the traffic density, the speeds of vehicles traveling on I-10, and the distance of only two or three car lengths between the Mitsubishi and the car it was behind.

Accordingly, Defendant's objections to the stop are without merit.

## *THE ROADSIDE QUESTIONING*

Defendant argues that the trooper improperly interrogated Defendant and his co-defendant without fully advising them of their *Miranda* rights. He complains that the trooper questioned them in such a way as to obtain conflicting answers for the purpose of obtaining probable cause to search the vehicle. Defendant contends that the trooper detained them long after the basis for stopping them had passed and that, because the questioning was performed for the purpose of obtaining suspicious information, he should have been *Mirandized* beforehand.

The State replies that as the trooper questioned Defendant within the legal confines of a traffic stop, no *Miranda* warning was necessary and the law does not preclude an officer from engaging a motorist in conversation while investigating routine traffic violations.

Under La.Code Crim.P. art. 215.1(A), once a law enforcement officer has conducted a valid traffic stop based upon reasonable suspicion that the person in the vehicle committed an offense, that law enforcement officer may demand of the vehicle's occupants their names, addresses, and an explanation of their actions though the questioning must be brief:

> During detention of an alleged violator of any provision of the motor vehicle laws of this state, an officer may not detain a motorist for a period of time longer than reasonably necessary to complete the

> investigation of the violation and issuance of a citation for the violation, absent reasonable suspicion of additional criminal activity. However, nothing herein shall prohibit a peace officer from compelling or instructing the motorist to comply with administrative or other legal requirements of Title 32 or Title 47 of the Louisiana Revised Statutes of 1950.

La.Code Crim.P. art. 215.1(D). Furthermore, "La.C.Cr.P. art. 215.1(D) does not preclude a police officer, who may lack reasonable suspicion of other criminal activity, from engaging a motorist in conversation while investigating a routine traffic violation." *State v. Cowan*, 99-2888, p. 1 (La. 6/16/00), 763 So.2d 583, 584.

"[R]oadside questioning of a motorist pursuant to a routine traffic stop does not constitute custodial interrogation sufficient to trigger an advisal of rights as required by the *Miranda* rule." *State v. Bourgeois*, 00-1585, p. 6 (La.App. 5 Cir. 3/14/01), 785 So.2d 848, 852.

> A *Miranda* warning must be given prior to interrogation after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. A warning is not required before there is general questioning of citizens in the fact-finding process, but only when the investigation ceases to be exploratory in nature.

*State v. Cooper*, 45,568, p. 14 (La.App. 2 Cir. 12/8/10), 55 So.3d 873, 881-82; *but see*, *State v. Gustavis*, 00-1855 (La.App. 4 Cir. 5/30/01), 788 So.2d 1242, *writ denied*, 01-1828 (La. 5/10/02), 815 So.2d 833 (holding that a *Miranda* warning becomes necessary for further questioning once the officer has developed probable cause to arrest the motorist). The *Cooper* court determined that basic questions such as where the motorist was coming from and where he was going do not require a *Miranda* advisement.

Accordingly, Defendant's contention that the trooper violated his constitutional rights by asking him questions for the purpose of fact-finding without first advising him of his *Miranda* rights is without merit.

21

*CONTINUED DETENTION*

Defendant contends that the trooper's continued detention of him and his co-defendant was also unconstitutional. He asserts that the trooper's statement of suspicious factors during the stop was insufficient or should not have been considered suspicious factors; therefore, the trooper's act in continuing to detain the couple was baseless and unjustified.

The State responds that the length of the stop was neither unreasonable nor a constitutional violation. The prosecution adds that, as Defendant did not speak English, the twenty-one minute traffic stop was not unreasonably long.

Under La.Code Crim.P. art. 215.1(D), law enforcement officers are prohibited from detaining motorists for unreasonably long periods of time. "A generalized suspicion or hunch that an individual is involved in criminal conduct is not sufficient to detain the individual or his automobile. A police officer must have a particularized suspicion based upon articulable facts." *State v. Burton*, 93-828, p. 4 (La.App. 3 Cir. 2/23/94), 640 So.2d 342, 345, *writ denied*, 94-617 (La. 4/7/94), 641 So.2d 203. "If the police officer has a specific suspicion of criminal activity, he may further detain the individual while he diligently pursues a means of investigation likely to quickly confirm or dispel the particular suspicion." *State v. Lewis*, 97-1244, p. 9 (La.App. 3 Cir. 3/6/98), 728 So.2d 1, 6, *writ denied*, 98-977 (La. 9/18/98), 724 So.2d 752 (citing *U.S. v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, (1985)).

This court has previously addressed a similar factual scenario for the purpose of determining whether the officer had reasonable cause to extend the investigation after a traffic stop:

> In the present case, defendants were validly stopped for driving in excess of the speed limit. Trooper Lafleur ran a check on both individuals which revealed that neither had criminal records.

22

Afterwards, the driver was given back his driver's license, warned to slow down, and told he was free to go. It was after these events had transpired that Trooper Lafleur approached the driver with the Consent to Search form.

Defendants argue in their brief that once the purpose for the initial stop had concluded and the defendants were told they were "free to go," any action taken by the police to search the defendants' vehicle was in violation of the defendants' right to be free from unreasonable searches and seizures. Trooper Lafleur filled out the Consent to Search form before he returned defendant-Burton's driver's license and told the defendants they were free to go; he asked defendant-Burton to look at the Consent to Search form seconds later. It is obvious that the trooper had the intent to search the defendants' vehicle after he had completed the routine duties for a traffic stop. The fact that the trooper finished the steps for the traffic stop with the statement "you are free to go" should not be construed to mean that all proceedings were concluded, that the initial reasonable suspicion had been dispelled, and that before any further actions could be taken the police had to re-establish reasonable suspicion on other grounds.

. . . .

The key issue in the case *sub judice* is whether or not Trooper Lafleur reasonably suspected defendants were engaged in criminal activity based upon "reasonable suspicion." We find, after review of the pertinent case law, that the suspicion of Trooper Lafleur was sufficient to reasonably believe defendants were engaged in criminal activity, and the continued detention of the automobile after defendants were given a warning and allowed to go was justified.

*Burton*, 640 So.2d at 346-47.

The evidence presented in the instant case shows that the traffic stop began at 8:17 a.m. Trooper Speyrer then questioned both Ms. Cisneros and Defendant, verified the validity of Ms. Cisneros' license, ran a criminal history check on both Ms. Cisneros and Defendant (which Trooper Speyrer said could take up to twenty minutes), issued a verbal warning to Ms. Cisneros for the traffic violation, returned her license and paperwork, asked for and obtained consent to search at 8:38 a.m., called for backup, had Ms. Cisneros move her car to a more sheltered location, had backup arrive, searched the vehicle, found illicit narcotics, and arrested Ms. Cisneros and Defendant at 8:58 a.m.

23

The suspicious factors Trooper Speyrer noticed included an unusually high level of nervousness in Defendant because he was the passenger, nervous behavior by Ms. Cisneros, a discrepancy in their stories concerning their point of origin, the license plate being registered to a different state than the one in which Ms. Cisneros was licensed, the recent purchase date of the vehicle, Defendant not knowing who the vehicle's owner was despite having been in a relationship with Ms. Cisneros for two years, the strong chemical smell emanating from the vehicle when strong smells are used to mask the odor of drugs, and the fact that Ms. Cisneros and Defendant had been traveling a known drug corridor from a state known to be a source for drug traffic.

Considering the circumstances of the stop and the testimony showing that the criminal history check could take up to twenty minutes, Ms. Cisneros' consent to search was not vitiated by an illegal detention.

*CUSTODIAL INTERROGATION*

Defendant gave one custodial interrogation on July 7, 2009, and another on July 9, 2009. He complains that the interviews were not recorded and that Officer Olivero had no independent recollection of the interview. Defendant argues that the testimony regarding the standard operating procedure for issuing *Miranda* warnings prior to interviews was constitutionally insufficient to prove that such a warning was given.

The evidence at trial clearly shows that Defendant was read his *Miranda* rights by law enforcement officers acting as interpreters prior to both of his custodial interrogations. Moreover, the *Miranda* warning and Defendant's subsequent waivers were also witnessed by the officers conducting the interviews. Contrary to the Defendant's contention that Officer Olivero did not specifically recall reading him his *Miranda* rights, the evidence shows that Officer Olivero

24

remembered reading Defendant his rights and accepting Defendant's waiver of those rights. Because Officer Olivero was not the official conducting the interview, he did not take notes. As a result, he did not have a complete recollection of the other statements Defendant made during the interview.

Accordingly, Defendant's argument on this issue is without merit.

## ASSIGNMENT OF ERROR NUMBER TWO

Defendant asserts, "It was error patent for the trial court not to have considered Mr. Cortez' [sic] *pro se* filing as a motion for new trial." He states that, following his conviction, he wrote a pro se letter to the trial court complaining of problems in the case. Defendant argues that it was error for the trial court to not consider his "letter" at sentencing; therefore, his sentence should be vacated and the matter remanded for consideration of his pro se complaint.

Defendant contends that he speaks Spanish and has a very limited understanding of English. He alleges that the interpreter used during the second interview was uncertain whether Defendant understood his *Miranda* rights and that the translator had occasional difficulties translating for Defendant during trial. After trial, Defendant sent a three-page letter to the trial court, written in Spanish, recounting the language problems Defendant had during the case. Defendant urges that these problems should have been the basis for a new trial. Defendant complains that the trial court did not address the contents of the letter even though the State offered the letter into evidence at the sentencing hearing. Defendant asks this court to vacate the sentence and remand the matter for consideration of Defendant's pro se complaint.

The State contends that the trial court's failure to consider Defendant's pro se motion for new trial was not error as defense counsel asserted a motion for new trial in conjunction with another motion. The record shows that the trial court

25

received a pro se letter from Defendant, written in Spanish, on June 9, 2010. Thereafter, the defense filed a motion seeking a post-verdict judgment of acquittal on the basis that there had been insufficient evidence to convict Defendant of attempted possession of heroin over 400 grams. Defense counsel asserted, in the alternative, that a new trial should be granted because the jury's verdict was contrary to law.

On June 15, 2010, the trial court conducted a hearing on Defendant's motion for acquittal followed by Defendant's sentencing. The defense did not mention the letter during its argument; instead, it maintained that the evidence had been insufficient to convict Defendant. Defendant presented no additional arguments prior to the trial court's ruling, which denied the motion upon finding sufficient evidence to convict Defendant. The trial court then considered the defense's alternative motion for new trial. When Defendant asserted that a new trial should be granted because there had been insufficient evidence to convict him, the trial court denied Defendant's alternative motion for new trial.

Next, the parties presented evidence for the trial court to consider in sentencing Defendant. During this portion of the hearing, the trial court noted for the record that he had provided both the State and the defense with copies of the letter Defendant sent to the court. The trial court then introduced a copy of the letter into evidence, and the prosecution introduced an interpretation of that letter into evidence without any objection by the defense. The translation contained no request for a new trial; it asserted Defendant's innocence, accused defense counsel of not visiting him in prison and of asking him not to speak about the case until trial, and claimed that law enforcement failed to contact the owner of the vehicle, which was an allegation already made at trial. Furthermore, after the letter was

introduced into evidence, defense counsel did not ask that the letter be considered a motion for new trial.

After the trial court imposed Defendant's sentence, Defendant filed a motion to reconsider the penalty given. On August 20, 2010, the trial court conducted a hearing on Defendant's motion to reconsider sentence, and defense counsel did not mention the Defendant's pro se letter at the hearing.

Though motions for new trial must be ruled on prior to sentencing, the record contains no indication that the letter contained a request for a new trial or that defense counsel considered the letter to be a motion for new trial. La.Code Crim.P. art. 853. Because "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence[,]" Defendant may not now assert that the letter was a motion for new trial when he did not ask the trial court to consider it to be one. La.Code Crim.P. art. 841.

Accordingly, this assignment of error is without merit.

## DISPOSITION

Defendant's conviction is affirmed. The trial court is instructed to inform Defendant of the correct provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within fifteen days of the rendition of this opinion and by filing said notice in the record of these proceedings.

**AFFIRMED WITH INSTRUCTIONS.**